**BRUNSWICK CORPORATION, Plaintiff,**

and

**Diab–Barracuda AB, Involuntary
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 534–88C.

United States Court of Federal Claims.

Nov. 30, 1995.

Douglas B. Henderson, Washington, D.C., with whom were Tipton D. Jennings IV, Steven M. Anzalone, and James W. Edmondson, of Finnegan, Henderson, Fanabow, Garrett & Dunner, for plaintiffs.

Steven M. Amundson, United States Department of Justice, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, and Vito J. DiPietro, Director, for defendant.

## OPINION

ROBINSON, Judge:

### The Klein Patent

This case was brought before this court pursuant to 28 U.S.C. § 1498(a) (1992). Plaintiff, Brunswick Corporation ("Brunswick"), asserts that the camouflage screens supplied to the government by Teledyne Brown Engineering ("Teledyne") having a polyester/steel base cloth, including all camouflage screens and repair kits supplied under the Contract Nos. DAAJ10–84–C–A117 (the "A117 contract") and DAAK01–85–D–B007 (the "B007 contract") and 10,500 polyester/steel camouflage screens supplied under Contract No. DAAK01–87–D0A060 (the "A060 contract"), infringe United States Patent No. 3,678,675 (the "Klein patent" or "'675 patent").

The Klein patent covers an antistatic fabric spun from a blend of electrostatically conductive and non-conductive yarns, which contain fibers that possess resistivities of less than $10^5$ ohm centimeters and greater than $10^{10}$ ohm centimeters, respectively. As stated in Claim 1, the claim most central to this dispute, the patent teaches:

1. An antistatic yarn comprising:
organic yarn combined with heterogeneous spun yarn, said spun yarn comprising organic staple fibers and conductive staple fibers, said conductive fibers radially migratorily clustered along the length of said heterogeneous spun yarn.

When these fibers are blended together in a spiralling, helical pattern according to the teaching of the '675 patent, the resulting embodiment is an antistatic fabric that remains electrostatically conductive over only short distances and can be mounted onto a backing to form carpet material. As used in the Klein patent, the term "antistatic" refers to material that is incapable of generating 2,500 volts of static electrical potential. The preferred embodiment of this invention is an antistatic carpet whose density, electrostatic properties, uniformity, and production can be varied to adapt to certain applications, including the camouflage radar-countermeasure screens involved in the case at bar.

***The Accused Screens.*** The camouflage screens accused of infringing the Klein patent are composed of a base cloth (or "greige cloth") woven from a yarn blended from polyester and stainless steel fibers. The base cloth is coated on each side with a polyvinylchloride ("PVC"). The base cloth acts to provide radar camouflage, and the PVC may be color-coated to provide optical camouflage. Teledyne subcontracted with Mount Vernon Mills Inc. ("Mount Vernon") to manufacture

and supply the base cloth used in the accused camouflage screens under the A117, B007 and A060 contracts.

Mount Vernon was responsible for blending and spinning the polyester/steel yarn and weaving it into the greige cloth. Specifically, the subcontract between Teledyne and Mount Vernon (Plaintiff's Exhibit ("PX") 385) effective February 22, 1985, provided that Mount Vernon would provide greige cloth in accordance with Teledyne Specifications 58527. According to those specifications the greige cloth was to be woven from a polyester and stainless steel blended yarn and used in a three layer camouflage fabric. PX 385, attachment 3. The polyester/steel yarn was to contain 3.1 +/− 0.3% by weight stainless steel fibers, which were to have a nominal diameter of 6.5 microns, an actual diameter of 8.0 microns, and a length of 50 mm. The yarn actually produced by Mount Vernon for the A117 and B007 contracts contained 2.8% by weight stainless steel.

Under the A060 contract Teledyne revised its specifications for the polyester/steel cloth. According to Teledyne Specification 58527 Rev. A (Teledyne's revised specifications), the stainless steel used in the polyester/steel yarn was to be 4.0 microns in diameter rather than 6.5 microns. The length of the fiber, 50 mm, and the blend level, 2.8 +/− 0.3%, remained the same. In October of 1989, Teledyne modified the specifications again, this time reducing the weight of the stainless steel fibers in the yarn to 2.2%.

***Mount Vernon's Manufacturing Process.***
The manufacturing of yarn generally involves a series of stages in which yarn fibers are prepared for spinning into yarn. The staple fibers used to make yarn usually arrive as a densely packed pressed bale of fibers. The compressed fiber bales must first be opened and the fibers separated into loose tufts; this is known as the opening process. If the staple fibers contain any heavy impurities, they are removed at this stage. Next, the fibers are further opened and cleaned during a process known as carding. During carding the fibers are separated and aligned and then condensed into a single continuous untwisted strand or bundle of fibers called a "sliver." The carding operation is generally carried out by cheesing the fibers between a fast moving cylinder having wire points and slow moving flat plates also clothed with wires. As a result of carding the mass of the sheet of fibers is reduced from about one pound per yard to just a few grams per yard. The slivers produced through carding are then collected and several of them, usually six or eight, are combined to form one output sliver about the same size as an input sliver in what is commonly referred to as the drawing or drafting step. During this step a number of slivers are fed into four sets of rollers (a front roll, a back roll, and a second and third roll), and the mass of the fibers are again reduced and the fibers blended. The drawing step may be repeated a number of times depending on the fibers involved and the intended use of the yarn. The first drawing step or frame is known as the breaker draw and the final drawing step or frame is known as the finisher draw. The output sliver from the drawing frame is then processed and condensed into a roving (a condensed sliver). The roving may then be spun into yarn.

Mount Vernon manufactured the polyester/steel yarn in accordance with the process described in its manufacturing plan submitted to Teledyne. PX 191. That process involved a number of steps. First, the polyester fibers were opened. Specifically, a 1.25 denier by ½ staple high tenacity (6.6 grams denier) polyester staple was hand-plucked and fed into hoppers which were equipped with beaters that broke up and blended the staple fibers. Next, after the opening process, the polyester fibers were pneumatically carried to reserve hoppers in the carding department and the polyester fibers were carded into sliver form. The standard weight of 100% polyester card sliver was 74 grams per yard. Then, several (seven) carded polyester slivers and one 6.5 micron, 50 mm stainless steel sliver were placed at the back rolls of an Ideal model draw frame (a roller drafting machine manufactured by the Ideal Corporation). The slivers were blended to create one polyester/steel output sliver. According to the manufacturing plan, this was a breaker drawing step in which the "polyester sliver [was] blended with the stainless steel sliver to produce a uniform

drawing sliver." PX 191, p. 8. In a finisher drawing stage, the polyester/steel output sliver from the breaker drawing was combined with several 100% polyester slivers at the back rolls of the Ideal draw frame and again blended to obtain the desired blend level of polyester to steel. After this finisher drawing step, the polyester to steel blend level was set. The finished polyester/steel sliver was placed in a roving machine and drawn and twisted into a 1.10 hank roving suitable for spinning. PX 391, p. 10. The roving was then placed on a spinning frame and further drawn and twisted to satisfy the size and strength criteria set forth in Teledyne's specification. The resulting polyester/steel yarn was then woven as both the warp and fill into the accused greige cloth.

### DISCUSSION

■ Plaintiff asserts the camouflage manufactured by Mount Vernon, purchased by the government under contracts A117, B007 and A060 from Teledyne, and comprised of a polyester steel base cloth infringes Claims 1, 3, 16, 17, and 18 of the Klein patent. Defendant denies that the accused camouflage infringes any claims of the Klein patent either literally or equivalently. Patent infringement actions before this court are governed by 28 U.S.C. § 1498, as well as the Patent Act as codified by 35 U.S.C. § 100, *et seq.* *See e.g., Alco Std. Corp. v. TVA,* 808 F.2d 1490, 1494 (Fed.Cir.1986); *Dow Chem. Co. v. United States,* 32 Fed.Cl. 11, 18 (1994). "The theoretical basis underlying a patent suit under § 1498 is that the government takes by eminent domain a compulsory, compensable license to use a patented invention whenever the invention is manufactured or used by or for the government." *Hughes Aircraft Co. v. United States,* 29 Fed.Cl. 197, 229 (1993) (citing *Motorola, Inc., v. United States,* 729 F.2d 765, 768 (Fed.Cir.1984)). Nonetheless, the applicable legal standards for claim interpretation as well as infringement are identical in "unauthorized use" patent cases under § 1498 as in those patent cases arising from Title 35 of the U.S.C. *Hughes,* 29 Fed.Cl. at 229 (citing *Lemelson v. United States,* 752 F.2d 1538, 1548 (Fed.Cir. 1985)).

■ Claim interpretation precedes infringement analysis. First the court must interpret the meaning and scope of the asserted claims; then, it must compare the properly construed claims to the accused product to determine whether it infringes. *Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1562 (Fed.Cir.1990), *cert. denied,* 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991); *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1121 (Fed.Cir. 1985). Ultimately, patentee (plaintiff) "bears the burden of proving infringement by a preponderance of the evidence." *Id.* at 1123; *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1582 (Fed.Cir.1988). *See Lee v. Dayton–Hudson Corp.,* 838 F.2d 1186, 1187 (Fed.Cir.1988); *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.,* 793 F.2d 1279, 1282 (Fed.Cir.1986).

### I. *Claim Interpretation.*

■ Claim interpretation, which is solely a question of law, is left exclusively to the courts and precedes both validity and infringement analyses. *Texas Instr., Inc. v. U.S. Int'l Trade Comm'n,* 988 F.2d 1165, 1171 (Fed.Cir.1993). After the claims, which define the metes and bounds of the invention, have been properly construed, they are compared to the allegedly infringing device. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 759 (Fed.Cir.1984). While a claim may not be interpreted one way for validity and another for infringement, there is a presumption that claims will be interpreted to uphold patent validity. *ACS Hosp. Sys., Inc. v. Montefiore Hosp.,* 732 F.2d 1572, 1574–75 (Fed.Cir.1984). There are two general, though not conclusive, guidelines to claim interpretation: (1) the terms in a claim "will be given their ordinary and accustomed meaning unless it appears that the inventor used them differently"; and (2) "[c]laims should be construed as they would be by those skilled in the art" to be as consistent or harmonious with the circumstances surrounding the patent prosecution and the patent application as possible. *Envirotech,* 730 F.2d at 759; *Autogiro Co. of Am. v. United States,* 181 Ct.Cl. 55, 62, 384 F.2d 391, 397 (1967); *Loctite Corp. v. Ultraseal Ltd.,* 781

F.2d 861, 867 (Fed.Cir.1985). In determining the meaning of the claims, which is a question of law, the court should look at the claim language, the specification, and the prosecution history. *Markman v. Westview Instr., Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (citing *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561 (Fed.Cir.1991)).

█ If necessary to ascertain the true meaning of the disputed claims, the court, in its discretion, may also look to extrinsic evidence such as expert and inventor testimony, learned treatises, and dictionaries. *Markman,* 52 F.3d at 980 (citing *Brown v. Piper,* 91 U.S. 37, 41, 23 L.Ed. 200 (1875)); *Seattle Box Co. v. Industrial Crating & Packing, Inc.,* 731 F.2d 818, 826 (Fed.Cir.1984) (stating that trial judge has sole discretion to determine whether or not he wants or needs an expert's assistance to understand a patent). Extrinsic evidence may prove helpful in explaining the meaning of difficult technical terminology or principals or merely the state of the art at the time of the invention. *Markman,* 52 F.3d at 980. Extrinsic evidence, however, may not be used to enlarge, vary, or contradict the terms of the claims. Rather, it may only be used to help the court understand the patent. *Markman,* 52 F.3d at 980–81; *U.S. Indus. Chems., Inc. v. Carbide & Carbon Chems. Corp.,* 315 U.S. 668, 678, 62 S.Ct. 839, 844, 86 L.Ed. 1105 (1942). It should not be used to clarify ambiguities in claim terminology. *Markman,* 52 F.3d at 986. Rather it should be used to explain language or terminology with which the court is unfamiliar or to clarify what the claims would mean to a person having ordinary skill in the art. *Markman,* 52 F.3d at 981. Testimony of a patent expert is merely offering a legal opinion that the court has complete discretion to reject, ignore or exclude. *Id.* at 983. "Extrinsic evidence, therefore, may be necessary to inform the court about the language in which the patent is written. But this evidence is not for the purpose of clarifying ambiguity in claim terminology. It is not ambiguity in the document that creates the need for extrinsic evidence but rather unfamiliarity of the court with the terminology of the art to which the patent is addressed." *Id.* at 986. The claims should distinctly and unambiguously claim the subject matter of the invention; section 112 requires that the specification contain a written description in "full, clear and concise terms" as to enable one of ordinary skill in the art to make and use the invention. 35 U.S.C. § 112; *Markman,* 52 F.3d at 986. Further, since claim construction is a question of law, testimony of a patent expert as to claims' interpretations is merely a legal opinion entitled to no deference by the court. *Markman,* 52 F.3d at 983, 986.

### A. Claim 1

Claim 1 provides as follows:

1. An antistatic fabric comprising: organic yarn combined with heterogeneous spun yarn, said spun yarn comprising organic staple fibers and conductive staple fibers, said conductive fibers radially migratorily clustered along the length of said heterogeneous spun yarn.

#### 1. "An antistatic fabric"

█ According to the preamble, Claim 1 relates to antistatic fabrics. The parties have disputed the degree to which the term "antistatic" should be viewed as a claim limitation. The extent to which the preamble should be considered a claim limitation has been much debated, but recently the Federal Circuit indicated that the preamble should be construed, like the rest of the claim, according to the general canons of claim construction. *Bell Communications Research Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 620 (Fed.Cir.1995). Indeed, says the Federal Circuit, "a claim preamble has the import that the claim as a whole suggests for it." 55 F.3d at 620. For example, if the preamble merely states a purpose or intended use of the claimed invention, then it may not be given the effect of a claim limitation. 55 F.3d at 620–21 (citing *Kropa v. Robie,* 187 F.2d 150, 152 (CCPA1951)). On the other hand, if the preamble is "necessary to give meaning to the claim and properly define the invention," 187 F.2d at 152, or "breathes life and meaning into the claims," it is given the effect of a limitation. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 866 (Fed.Cir.1985); *cf. In re Paulsen,* 30 F.3d 1475, 1479 (Fed.

Cir.1994) (stating that the specifications revealed that the term "computer" in the preamble breathed life and meaning into the claim and was a necessary limitation such that prior art references had to disclose a computer); *DeGeorge v. Bernier,* 768 F.2d 1318, 1322 n. 3 (Fed.Cir.1985). Thus, "[a]lthough no 'litmus test' exists as to what effect should be accorded words contained in a preamble, review of a patent in its entirety should be made to determine whether the inventors intended such language to represent an additional structural limitation or mere introductory language." *In re Paulsen,* 30 F.3d at 1479; *see also London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1539 (Fed.Cir.1991) (considering whether a word in the preamble is a structural limitation rather than merely "a suggested use" or "clarifying language" and finding "shank" of a garment hangar, defined in the specification, a structural limitation).

An analysis of the specification, the claims, and the term "antistatic" itself reveals that "antistatic" is used as clarifying, introductory language or as a suggested use, not as an actual structural claim limitation. The term "antistatic fabric" is defined in the specification as "a fabric not capable of generating a static electrical potential of 2,500 volts on an individual under ordinary use conditions." *Klein,* Col. 2, lines 28–31. Indeed, the purpose of the invention is to reduce the amount of static electricity a fabric generates and thus, the term antistatic relates broadly to anything which diminishes the amount of static electricity in an object. A fabric may accomplish this whether or not it is being used specifically for its antistatic properties. Apart from the preamble, the body of Claim 1 on its own defines a complete and functional fabric structure. *Kropa v. Robie,* 187 F.2d at 152 (finding that the preamble is not a limitation where the claim language apart from the preamble properly defines the invention); *see also Arshal v. United States,* 223 Ct.Cl. 179, 195–98, 621 F.2d 421, 430–31 (1980) (holding that when the preamble merely states the intended purpose of the claimed invention, a compelling reason must exist to treat it as a claim limitation). Use of the term "antistatic" is not necessary to complete the structure. However, the term does help explain what the fabric will be used for and why the fabric is designed the way it is. In other words, the term "antistatic" puts Claim 1 into context, providing purpose and meaning for the claimed structure. Accordingly, the court finds that rather than being a claim limitation, the term "antistatic" is merely a statement of the intended purpose of the fabric and would include any fabric which generally prevents the build up of static electricity.

2. **"organic yarn combined with heterogeneous spun yarn, said spun yarn comprising organic staple fibers and conductive staple fibers"**

The antistatic fabric of Claim 1 is an "organic yarn combined with heterogeneous spun yarn." The heterogeneous spun yarn "compris[es] organic staple fibers and conductive staple fibers...." The terms "organic staple fibers" and the "conductive staple fibers" are clearly defined in the specification and their meanings are not in dispute. The organic staple fibers are "electrostatically non-conductive staple fibers," *Klein,* Col. 3, lines 49–50, and may be "made from synthetic materials including nylon, acrylic, polyester and the like, as well as natural materials including wool, cotton, flax, and the like or any desired mixtures thereof." *Klein,* Col. 3, lines 53–56. Conductive fibers are "electrostatically conductive staple fibers," *Klein,* Col. 3, lines 51–52, and may be made from "materials including metal fibers ... organic fibers having an electrostatically conductive surface coating thereon, or the like." *Klein,* Col. 3, lines 56–59. Instead, the dispute revolves around the meaning of the terms "organic yarn" and "heterogeneous."

a. **"organic yarn"**

Plaintiff argues that the term "organic yarn" should be interpreted to mean a yarn which is composed mostly of organic fibers but which could contain two or three percent of non-organic fibers such as steel. Defendant, on the other hand, argues that "organic" means that the yarn should contain 100% organic fibers. Otherwise, says defendant, under plaintiff's interpretation the "organic yarn" could be the same as the

heterogeneous yarn comprising organic and conductive staple fibers. Since the organic yarn requirement and heterogeneous yarn requirement are separate limitations, defendant argues they should mean different things.

According to the specification the desired antistatic carpet is a combination of a "fine discontinuously electrostatically conductive staple blended yarn" and "standard carpet facing yarns." *Klein,* Col. 3, lines 49–52. Although not specifically stated in the specification, it is clear that the claimed "organic yarn" is the standard carpet facing yarn and the claimed "heterogeneous spun yarn" is the electrostatically conductive blended yarn in the carpet system combination. However, knowing that the "organic yarn" is standard carpet facing yarn does not necessarily answer the question of whether the organic yarn may contain conductive fibers. The court must look further into the specification and the claims to interpret "organic yarn." While the specification does not specifically define "organic yarns," *per se,* it does define "organic fibers." Significantly, "organic fibers" are defined as "electrostatically *non-conductive* staple fibers" as opposed to "conductive staple fibers." *Klein,* Col. 3, lines 49–52 (emphasis added). In this context it is clear that the organic fibers are something different from the conductive, *i.e.,* metal, fibers and that the organic fibers should be electrostatically non-conductive. Moreover, the evidence clearly shows that in this art "metal fibers" are not organic fibers under their normal and accepted meanings.

■ Given that the term "organic," when used in the specification to describe a type of yarn fiber, is defined as "electrostatically non-conductive," the court finds no reason not to give it a similar meaning when used in the same patent to describe a yarn. Inventors must use words in the same way throughout the patent, especially in the claims and the specifications. *Fonar Corp. v. Johnson & Johnson,* 821 F.2d 627, 632 (Fed. Cir.1987) (citing *Autogiro,* 181 Ct.Cl. at 63, 384 F.2d at 397). Plaintiff has pointed to nothing in the claims, specification, or prosecution history which even suggests that the term "organic" has differing meanings when

used to describe a "yarn" as opposed to a "fiber."

The court additionally notes that the "organic yarn" limitation is separate from the "heterogeneous spun yarn" limitation. As defendant points out, if the organic yarn could include conductive fibers it could be a heterogeneous yarn as defined in Claim 1 and these limitations would, thereby, be the same. Since these are distinct limitations, the court is unwilling to ascribe to them the same meaning. Thus, the organic yarn in Claim 1 is yarn made up of organic fibers and does not contain conductive fibers. In making this determination, the court recognizes that in practice an organic yarn may have a small amount of impurities resulting in some conductivity; however, since "organic" has been specifically defined in the specification as "non-conductive," it is clear that this limited amount of conductivity should not be intentional.

### b. "heterogeneous"

■ Next the parties dispute the meaning of the term "heterogeneous" as it is used in Claim 1. Claim 1 specifies that the organic yarn is combined with "heterogeneous spun yarn, said spun yarn comprising organic staple fibers and conductive staple fibers...." The parties' experts, as well as the inventor, Mr. Klein, all agreed that the term "heterogeneous" did not have a common meaning in the art at the time of the Klein patent. Defendant's expert, Dr. Wagner, testified that he would normally interpret a heterogeneous yarn to be a hybrid—that is, a yarn which is a mixture of two or more fibers. The court agrees that this is a reasonable definition given the normal meanings of the terms "homogeneous" and "heterogeneous." Indeed, in connection with the U.S. Patent No. 3,733,606 ("Johansson patent," "'606 patent," or "Johansson '606"), which plaintiff also contends defendant has infringed and will be analyzed later, the court has little trouble interpreting "inhomogeneous" to mean a mixture of two dissimilar materials. Nonetheless, because "[t]he dictionary does not always keep abreast of the inventor ... patent law allows the inventor to be his own lexicographer." *Autogiro,* 181 Ct.Cl. at 62, 384 F.2d at 397.

After reading the specification, it is apparent that in the context of this patent, the terms "homogeneous" and "heterogeneous" are being used to describe the degree to which fibers are blended. According to the specification, "[i]t is axiomatic in the textile industry that uniform, intimate and homogeneous blends of spun textile yarns are desired, whether different fiber materials or nominally the same fiber materials are being blended." It further states that the invention involved produces "fine heterogeneous hybrid, non-uniform, non-intimate and non-homogeneous spun blended yarn...." Fig. 1 of Klein describes a typical cross section of a homogeneous yarn, whereas Figs. 4 and 5 are described as heterogeneous or "non-uniform, non-intimate and non-homogeneous" cross sections of the invention.

The heterogeneous yarn is described in the specification as non-uniform and non-intimate. Non-uniform implies that there is an uneven distribution of fibers throughout the cross-section, i.e., that more fibers are found in one section of the yarn than in another. "Intimate" is really just another way of describing a uniform blend. Non-intimate, therefore, would be a non-uniform blend. From its use in the specification it appears the term "heterogeneous" is being used to describe a blended yarn which is not very evenly or uniformly blended. The figures are not inconsistent with this definition. While the fibers in Fig. 1 are clearly not blended so that the cross-section is entirely uniform throughout or purely "homogeneous" in a technical sense, they are more evenly distributed than are the fibers in Figs. 4 and 5.

A problem arises, however, in determining at what point between Figs. 1 and 5 a homogeneous blend becomes heterogeneous. Would a yarn that is less uniform than that shown in Fig. 1 but more uniform than those shown in Figs. 4 and 5 be homogeneous or heterogeneous? The Klein patent provides little guidance in making this determination. Thus, the court must rely on the definition of homogeneous and heterogeneous contained in the specification and the Figs. 4 and 5 as examples of heterogeneous yarns and Fig. 1 as an example of a homogeneous yarn.

Defendant's expert, Dr. Wagner, testified that heterogeneous as used in the patent means "the metallic fibers are pulled off to the side and grouped together." Record ("R.") at 2050. The court agrees that this is what appears to be shown by Figs. 4 and 5 and the specification. The example of a homogeneous cross-section shown in Fig. 1 has conductive fibers distributed throughout the cross-section. A person having ordinary skill in the art must be able to read a claim and determine its boundaries. Since the patent does not describe at exactly what point a homogeneous blend becomes heterogeneous, one of ordinary skill in the art would look at the cross-section of the yarn to see if it was more like Figs. 4 and 5 or more like Fig. 1 in determining whether the yarn was infringing. Thus, as illustrated by the figures, a blend is heterogeneous if the conductive fibers are found on one side or in part of the yarn and homogeneous if the fibers are found throughout the cross-section of the yarn. Beyond that, the determination of whether a yarn is homogeneous or heterogeneous will have to be made on a case by case basis.

Plaintiff suggests that "homogeneous" as shown in Fig. 1 means a random distribution. By negative implication, the court assumes plaintiff contends that "heterogeneous" means non-random. The court, however, does not find the term "random" particularly useful or apt in this situation since the location of all the conductive fibers in all of the yarn examples, including those in Figs. 1, 4 and 5, is for the most part random. All the experts agreed there is a certain amount of randomness in the yarn blending process and that one can not be assured of the exact placement of any fiber.

Plaintiff also argues that whether or not a yarn is homogeneous can be determined from the way the yarn is blended and that a blending process employing only two drawing stages necessarily produces a heterogeneous yarn. Because of this contention, considerable time was spent at trial arguing how many drawing stages are required to produce a homogeneously blended yarn. Before addressing plaintiff's argument in this respect, a review of the yarn manufacturing process is appropriate.

In general, processing a yarn involves many stages. Preliminarily the staple fibers are opened into loose tufts and the heavier impurities removed. Next, the fibers are further cleaned, their mass reduced, and fiber alignment started during the process of carding. As a result of carding, the fibers are formed into a group of short, loose, untwisted fibers called a sliver. Several slivers are then combined and blended in a drawing or drafting machine which further aligns the fibers, reduces their mass and produces a single output sliver. The drawing or drafting step may be repeated a number of times. After the desired number of drawing steps have been performed, the output sliver is turned into a roving—a condensed sliver. The roving is then spun into yarn.

No one disputes that the earlier in the yarn manufacturing process different fibers are combined the more well blended the resulting yarn will be. For example, all other aspects being equal, if staple fibers are combined in the early stages of the process, such as in the carding stage, the resulting yarn blend will be more even or uniform than it would if the fibers were combined later, such as in the drawing stage. Such is the practice of yarn manufacturers when trying to obtain high quality blends for clothing. When the fibers are not combined until the drawing or drafting stage the resulting yarn will not be as well blended unless more drawing or drafting steps are used. The greater number of times the fibers are drawn, the more mixed and more uniformly blended the yarn will be.

According to plaintiff, if the organic fibers and the conductive fibers (as those terms are used in the Klein patent) are not combined until the drawing stage, many drawings will be needed for the yarn to be a well blended homogeneous yarn. Specifically, plaintiff argues that three drawings are necessary; two drawings, says plaintiff, would not be enough. Plaintiff's argument is best understood when considered in the context of the Klein patent and the process used at Mount Vernon to blend the yarn found in the accused camou-flage. The Klein patent describes producing a heterogeneous yarn through a "completely unorthodox method." In contrast, defendant argues that Mount Vernon employed conventional blending techniques to produce a homogeneous yarn.

The specification of the Klein patent describes the production of a fine heterogeneous yarn using blending techniques contrary to accepted standards. Specifically, the process involves combining "at least one pre-drawn organic sliver with a consolidated tow of conductive filaments. The organic sliver and tow of conductive filaments are passed in a roller drafting machine to produce the heterogeneous or non-homogeneous blend." *Klein,* Col. 4, lines 19–25. "Tow" is a term borrowed from the wool industry and refers to a bundle of fibers that is similar to a sliver but contains only a single continuous filament, making it much smaller than a sliver. Fig. 2 illustrating this procedure shows the tow of conductive fibers being introduced underneath the organic sliver. Alternatively, the specification teaches that the tow of conductive filaments may be introduced into the roller drafting machine sandwiched between the organic slivers. *Klein,* Col. 4, lines 31–34. This is illustrated by Fig. 3. "The resultant sliver is then processed on a roving frame to produce a roving. The roving is then spun into yarn by the use of single roving spinning." *Klein,* Col. 4, lines 31–40. The specification also describes "another similar method" in which an "organic fiber sliver and conductive fiber sliver are passed once through a pin drafter, reduced on a roving frame and single roving spun...." A pin drafter[1] accomplishes the same objective as roller drafting. Thus, the unconventional and unorthodox methods of producing a heterogeneous yarn described in the specification generally entails combining at least one pre-drawn organic sliver with a tow of conductive filaments at the drawing stage and performing a single draw.

Mount Vernon used a single roving spinning system with two drawing operations. Steel, a conductive fiber, was introduced as a

---

1. A pin-drafter is a mechanical device used to attenuate the total mass of fiber material. It is composed of a set of eight to ten intersecting combs or pins. As fibers are pulled through these pins, they are separated.

50 mm sliver at the back rolls of an Ideal draw frame in a first drawing step, called breaker drawing, and combined with several (seven) previously carded polyester slivers to create a polyester/steel sliver. The resulting polyester/steel sliver was then combined and blended with several more 100% polyester slivers in a second drawing step, called finisher drawing, to produce a polyester/steel sliver with a relatively low weight percentage of steel fibers. At the end of this second drawing stage, a rover drew and twisted the sliver into a roving that was suitable for blending. No appreciable blending of the fibers occurred during this stage. The roving was then twisted and spun into yarn.

Riegal Corporation, an unsuccessful bidder in the competitive camouflage solicitation, supplied Teledyne with a copy of its proposed manufacturing plan to make a polyester/steel based cloth. Teledyne forwarded a copy of this plan to Mount Vernon with the warning that Riegal's manufacturing plans were rejected by the Army several times, requiring new submissions. Riegal's plan suggested using three drawing steps to "assure uniformity of the yarn and uniform distribution of stainless steel fibers." Plaintiff says that Mount Vernon developed their process separately from Riegal's. Plaintiff argues that Riegal's manufacturing process was the conventional method of producing a homogeneous blend and that, had Mount Vernon followed Riegal's plan, it would have produced a homogeneous blend. Instead, because it only performed two draws, plaintiff argues that Mount Vernon's yarn is necessarily heterogeneous.

The various blending scenarios can be summarized as follows: (1) the patent teaches introducing a pre-drawn sliver and a conductive tow of filaments at the drawing stage and drawing once to produce a heterogeneous blend; (2) the plaintiff agrees that introducing conductive filaments at the drawing stage and completing three draws (as proposed by Riegal) produces a homogeneous blend; and (3) Mount Vernon introduced a stainless steel sliver at the drawing stage and completed two draws. The issue before the court then is what type of blend is produced by two draws, *i.e.*, is it necessarily a homogeneous or heterogeneous blend? The court cannot say that two draws necessarily produces either.

While it describes an "unconventional" and "unorthodox" technique of producing heterogeneous yarn, the Klein patent does not state what the conventional techniques were. Defendant argues that the unconventional technique described in Klein involved using only one drawing stage and that using two-stage drawing was conventional. Plaintiff on the other hand argues that two-stage drawing as well as one-stage drawing was unconventional and that three-stage drawing was conventional. In fact, plaintiff argues that "the clear weight of the evidence" establishes that three drawing steps are required to blend organic fibers and steel fibers into a homogeneous yarn. Plaintiff, however, actually produces very little evidence to that effect.

The only evidence offered by plaintiff that three drawing stages were necessarily needed to produce a homogeneous blend was the testimony of its expert. That expert, however, also admitted that the invention described in the Klein patent differed from homogeneous blending by introducing the tows to be blended at the drawing stage and drawing only once. Defendant, on the other hand, not only offered its expert's, Dr. Wagner's, testimony that two drawing steps were conventional in the late 1960's and early 1970's, it also offered an invention disclosure form prepared by the inventor, Mr. Klein, to show that two drawing operations were conventional.

In a document entitled "Technique For Blending Brunslon Yarn" dated February 2, 1970, Mr. Klein describes both his new technique for creating a yarn which ultimately was disclosed in the Klein patent and the then-normal technique. In this invention disclosure, Mr. Klein notes that traditionally in the textile field yarn was considered at its best when it was "as well-mixed as possible," but that in the case of yarns the objective was "the greatest degree of electrical continuity in the yarn by virtue of the close proximity of the relatively rare metal fibers in the non-conductive matrix." According to this invention disclosure, Mr. Klein accomplished his objective by "introducing the con-

tinuous filament steel fibers in the blending and breaking operation in a relatively small bundle...." Further, Mr. Klein makes it clear this was the only drawing or doubling to occur. Specifically, he states "the organic staple material ... [had] previously been leveled and parallelized by drawing or pin drafting so *no doublings occur after addition of the steel.*" (Emphasis added). This, according to Mr. Klein, was in contrast to "conventional blending" wherein this step "would normally [have been followed] by at least one six or eight factor doubling and drawing before roving...." Thus, the inventor, Mr. Klein, describes as conventional combining steel and organic fibers in a breaker drawing and following that by "at least one" more drawing step. This invention disclosure, therefore, confirms that Mr. Klein considered two drawings conventional and that his invention involved using only one drawing—a breaker drawing.

In a weak attempt to refute this admission by Mr. Klein, plaintiff argues that this invention disclosure does not state that conventional methods involved using two or more drawings. Plaintiff argues that where the invention disclosure states that during conventional blending the first drawing step "is normally to be followed by at least one six or eight factor doubling and drawing," it means that at least two more drawing stages are used. Plaintiff emphasizes that the invention disclosure specifies "doubling *and* drawing." According to plaintiff "[s]ince 'doubling' is a process similar to drawing ... the 'doubling *and* drawing' describes two or more drawing steps, for a total of three." This argument is so wholly lacking in merit that the court is reluctant to address it. There is no ambiguity in Mr. Klein's invention disclosure; "doubling and drawing" is being used to describe one stage or step in the yarn manufacturing process. Although plaintiff says "doubling" is a process similar to "drawing," in fact, "doubling" happens during the "drawing" stage. As the parties stipulated, "doubling" is a "process for combining several strands of sliver, roving, or yarn in yarn manufacturing." During drawing, yarn slivers are combined or, in other words, "doubled." Since these are similar terms for the same steps, there would be no reason to use them to describe separate steps as plaintiff asserts. Moreover, it is evident from the document that these terms are being used to describe the same step. Earlier in the disclosure, Mr. Klein states that the yarn "blend is normally accomplished by a geometric mixing of the fiber bundles when they are first brought together and subsequent intermingling by carding and/or *repeated* doubling and drawing operations." The use of the modifier "repeated" indicates that "doubling and drawing" describes one step. Under plaintiff's strained interpretation, this sentence would state that the blending of fibers is followed by repeated two-drawing operations. Thus, under this interpretation, Mr. Klein would be saying that the breaker drawing step would normally be followed by multiples of two drawing operations. This is clearly not the intent of Mr. Klein as disclosed in this invention disclosure. The conventional method, according to Mr. Klein prior to filing his application, involved a first mixing or breaker drawing followed by at least one drawing step. It is this method, therefore, according to Mr. Klein that would produce the conventional homogeneous blend.[2]

Plaintiff's argument that two drawings necessarily produce a heterogeneous yarn fail for other reasons as well. Many factors contribute to how well a yarn is blended besides the number of times the fibers are

---

2. Defendant produces other evidence, such as technical articles and patents, to show that two drawings were conventional. However, these articles or patents have publication or filing dates later than the filing date of the Klein patent and, as a result, are not very helpful in determining what was conventional prior to the Klein patent. Moreover, in view of Mr. Klein's disclosure of two drawings being conventional prior to his filing a patent application, these articles and patents are unnecessary to establish what was

conventional. Plaintiff also submits a manufacturing plan by Riegal Corporation, which involves using three drawing steps to blend polyester and steel fibers, to show that three drawings was conventional. However, the Riegal plan does not proclaim that its three-stage drawing plan is the only conventional method or that two drawing stages is unconventional. Moreover, the Riegal manufacturing plan is dated after the filing date of the Klein patent and, likewise, is of limited usefulness in showing what was conventional at the time the patent was filed.

drawn. For example, different drawing machines having different rollers with different spacing between the rollers—all of which may create a more or less uniform blend—may be used. Likewise different roving machines may do more or less blending of the roves. In addition, as defendant points out, whether the fibers are combined as slivers or tows will affect how well the yarn is blended. Take the procedure described in the Klein patent for example. In that case the conductive fiber is introduced in tow form, that is, as long continuous filaments. If the conductive fiber is introduced in sliver form, that is as cylindrical fibers generally around one half inch in length (as was the case at Mount Vernon), the resulting yarn may be more well blended because slivers are smaller than tows and the fibers, therefore, can migrate more readily during drawing. The procedure used at Mount Vernon differed from the procedure described in the Klein patent in other ways as well. The procedure described in the Klein patent involved using a pre-drawn organic sliver. According to the invention disclosure prepared by Mr. Klein, this was done so that no additional doublings would occur after the step in which the steel was added. In essence, as defendant argues, the organic sliver is pre-drawn in Klein so that a finisher drawing step is not necessary. In the process used at Mount Vernon the organic slivers were not pre-drawn and a finishing drawing step was used. Thus, the court cannot say that introducing the conductive fibers at the drawing stage and only drawing twice means that the yarn is heterogeneous.

### c. "said conductive fibers radially migratorily clustered along the length of said heterogeneous spun yarn"

The last limitation of Claim 1 is that the conductive fibers be "radially migratorily clustered along the length of said heterogeneous spun yarn." The only guidance the specification provides in interpreting this limitation is the statement that "It has been observed that this cluster 36 of fibers 34 migrates radially along the length of the yarn 30 as shown in Fig. 10." Thus, Fig. 10 is the only illustration of what "radially migratorily clustered" means. Defendant argues that "radially migratorily clustered" means that the stainless steel fibers generally should appear in a barber pole arrangement, that is, the steel fibers follow a generally helical path around the outer periphery of the yarn. Plaintiff argues that this phrase means that the cluster of stainless steel fibers travels in a helical path that changes with respect to a centerline. In other words, that the cluster of fibers follows a spiraling path whose radius changes such that the conductive fibers many be on the outer periphery of the yarn at one point and a distance inside the yarn at another point. Both parties argue their position is supported by Fig. 10. Defendant says Fig. 10 shows the cluster of stainless steel fibers following a helical path around the outer periphery of the yarn while plaintiff says Fig. 10 shows the helical path of the cluster of stainless steel fibers changing positions along the radius of the yarn. After examining Fig. 10, it is not clear which situation it was intended to depict; thus, it does not support either party's argument.[3] The words "radially migratorily clustered" themselves, however, support plaintiff's argument.

As used in Claim 1, "radially" modifies "migratorily," which modifies "clustered." Given their ordinary meaning, radially means along the radius, migratorily means moving, and cluster means grouped together. Thus, Claim 1 requires that the conductive fibers are grouped together and that this group

---

**3.** Fig. 10 contains an obvious spatial inaccuracy with respect to the positional change of the conductive fibers. Presumably, plaintiff argues that Fig. 10 shows the radially position of the steel fibers changing because the fibers 36 in Fig. 10 on the left-hand side start on the front outer periphery of the yarn and appear to move through the yarn to the back side as shown by the dashed lines. It is at this point, where the conductive fibers turn and follow a path along the outer periphery on the front side of the yarn, that the inaccuracy becomes apparent. The conductive fibers could not physically follow the path depicted. As a result, Fig. 10 is in error. Either it was intended that the fibers 36 on the left-hand side started at the outer periphery of the back side with the fibers moving in the barber pole arrangement as argued by defendant; or the solid line of the conductive fibers on the front side of the yarn should have been dashed to show the fiber movement from the back side to the front side to show the migration as plaintiff argues.

moves along the radius. The court admits to having some difficulty in determining the meaning of this limitation as migration implies movement and the fibers are not moving. However, the claim also specifies that the migration is also along the length of the heterogeneously spun yarn. Thus, in this context it appears the term "radially migratorily" is being used to describe a spatial relationship of the cluster from one point to another along the length of the yarn. This limitation, therefore, means that the position of the group of fibers along the radius changes as its position changes along the length of the yarn. In practice, due to the twisting of the yarn as shown in Fig. 10, the clusters of fibers will also rotate around the yarn in a helical pattern although that is not necessarily required by the language of Claim 1 itself.

A great deal of time has also been spent arguing as to the meaning of the term "cluster" as used in the claims. In principle the parties agree that generally a cluster would be a group or bunching of fibers. Indeed, this is consistent with the standard definition provided by WEBSTER'S II DICTIONARY (1988) at 274. In practice, however, the parties dispute what constitutes a cluster. Plaintiff argues that no maximum distance is required to constitute a cluster and that cluster should not be viewed as a measure of the "tightness" of the conductive fibers. Defendant contends that Plaintiff's position is that conductive fibers are clustered as long as they are grouped closely enough to be electrically conductive. On the other hand, defendant argues that to constitute a cluster the fibers should appear in one quadrant of the yarn. Neither view is entirely correct. The court agrees that there is no *per se* number of fibers or distance between fibers which constitutes a cluster or that a group of fibers must appear in a quadrant of the yarn to constitute a cluster; however, a cluster, by its own definition, implies that more than one, perhaps even three or four or five, fibers are grouped close together. The specification, while not defining "cluster," supports this definition. In the description of the drawings contained in the specification, Fig. 4 is described as showing the "conductive fibers in a compact cluster form," and Fig. 5

is described as showing the "conductive fibers in cluster form." In each case, as defendant points out, the conductive fibers are shown closely together—within a few fiber diameters of at least one other conductive fiber and off to one side. The conductive fibers are not found throughout the cross-section. Thus, as used in the Klein patent, "cluster" means that the conductive fibers are bunched or grouped closely together. However, whether certain fibers in yarn constitute a cluster can only be determined on a case by case basis.

### B. Claim 3

■ Claim 3 is also at issue in this case. Claim 3 depends from Claim 1 and provides as follows:

3. The fabric of Claim 1 wherein said conductive fiber contact is discontinuous at preselected distances along the length of said spun yarn.

Defendant argues that use of the term "preselected" denotes non-random distances—conductive lengths selected by design, not by chance. Plaintiff, on the other hand, argues that "conductive fiber contact [ ] discontinuous at preselected distances" means that the conductive fibers should be of a length to provide electric conductivity yet not so long as to create an electric shock hazard and that the Klein patent discloses no actual length for the "pre-selected distances" and that none should be inferred. According to plaintiff the actual length may vary within certain ranges according to the weight ratio of conductive material.

The specification states, "In order to prevent the disadvantage of continuous contact between the conductive fibers, the proper weight ratio (number of conductive fibers per yarn cross section), the proper heterogeneous blending and the proper spinning provide yarns that exhibit contact between conductive fibers over preselected short lengths of the yarn." *Klein*, Col. 5, lines 17–23. In the first five examples in the specification, the weight ratio of conductive fibers and the resulting electrical contact length are given. In example 1, the metal fiber constituted 25% of the total yarn weight, and the yarn exhib-

ited continuous contact between conductive fibers over a length ranging from two feet to three feet. According to example 2, 20% by weight conductive fibers produced conductive lengths of 2 to 2½ feet; example 3, 15% by weight produced conductive lengths of 1½ to 2 feet; example 4, 10% by weight produced conductive lengths of 1 to 1½ feet. The specification also indicates that it was recognized that textile blending is not "precise and demonstrably accurately reproducible," such that there would "also be a few minor exceptions to the longest conductive contact length." *Klein,* Col. 5, lines 34–37.

The court agrees with defendant that the term "pre-selected" suggests a certain non-randomness. "Pre-selected" implies that before the yarn is manufactured certain desired conductive fiber lengths are selected. From the specification, it appears that those lengths are selected by choosing a certain weight ratio of conductive fibers to non-conductive fibers. That is not to say that merely the selection of a non-conductive fiber weight percentage necessarily means that the electrical contact length has been "pre-selected" since in most, if not all, manufacturing situations the relative fiber weight ratios are selected before-hand. Rather, what is needed to satisfy the claim limitation is the selection of a conductive fiber weight percentage for the purpose of obtaining a certain range of conductivity lengths. Simply showing a pre-selected weight ratio is insufficient to satisfy the claims for another reason as well. There could be other means for a manufacturer to inject a certain amount of randomness into the process so that the range of discontinuities would not be pre-selected. The manufacturing process itself has to be examined to determine if this limitation is satisfied.

### C. Claim 16

Claims 16, 17 and 18 are also in issue, for the parties have stipulated that Claims 17 and 18 stand or fall with Claim 16. Claim 16 provides:

> 16. A fine hybrid textile yarn comprising: a heterogeneous blend of electrostatically non-conductive staple fibers and electrostatically conductive staple fibers radially migratorily clustered along the length of said yarn, said yarn, being continuously electrostatically conductive along a cyclic length thereof, each cycle having a length of approximately 8 feet or less and said yarn having electrostatic discontinuities existing between each cyclic length.

Many of the terms in Claim 16 are used in the same manner as Claim 1 and those terms should be interpreted as they were in Claim 1. Specifically, the heterogeneous blend of conductive and non-conductive staple fibers radially migratorily clustered should be interpreted in the same manner as in Claim 1. The portions of Claim 16 not found in Claim 1 are "a fine hybrid textile yarn" and the yarn "being continuously electrostatically conductive along a cyclic length thereof, each cycle having a length of approximately 8 feet or less and said yarn having electrostatic discontinuities existing between each cyclic length."

#### 1. "A fine hybrid textile yarn"

In regard to the "fine" requirement of Claim 16 the specification states that a fine heterogeneous blended yarn is from 45 Tex to 10 Tex. *Klein,* Col. 5, lines 6–8.

#### 2. "electostatically conductive along a cyclic length"

█ As both parties note, "cyclic length" is not defined in the specification. Plaintiff argues that like the discontinuities in Claim 3, "cyclic lengths" refers to the various short lengths of conductivity that are present in the yarn. Plaintiff argues that cyclic does not mean regular or repeating actual lengths but merely that the conductivity repeats itself. The court agrees with defendant, however, that the term "cyclic" connotes a regular or periodic distance. Moreover, since the word "cyclic" modifies the term "length," it is the length of electrostatic conductivity that repeats in a cyclic manner, not just the conductivity.

### II. *Infringement.*

#### A. Literal Infringement

█ The infringement analysis involves two steps. First the scope and meaning of the patent claims at issue must be determined through claim construction. *Mark-*

*man v. Westview Instr., Inc.,* 52 F.3d 967, 976–79 (Fed.Cir.1995) (en banc), *cert. granted,* —— U.S. ——, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995). The second step is to compare the properly construed claims to the accused device and determine whether the former read on the latter. *Id.* at 976; *Texas Instr.,* 988 F.2d at 1171. "It is ... well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *London,* 946 F.2d at 1538 (quoting *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed.Cir. 1985)). Direct infringement also occurs when one "without authority makes, uses or sells any patented invention." 35 U.S.C. § 271(a) (1952).

### 1. Claim 1

#### a. "an antistatic fabric"

■ In this case, defendant argues that its camouflage screen is not an antistatic fabric and that it is, therefore, outside the scope of Claim 1. The accused camouflage cloth is a polyester/steel cloth coated with a PVC. The PVC, says defendant, is a dielectric which insulates the stainless steel fibers in the polyester/steel cloth from the environment and that the camouflage does not have any antistatic properties. In addition, defendant argues that the military specifications contain no requirement that the camouflage have antistatic properties. Thus, says defendant, the accused camouflage is outside the scope of Claim 1. The court, however, does not read Claim 1 so narrowly.

The court found that the term "antistatic" is used more as clarifying language or as an intended use than as a specific claim limitation. Even if considered as a specific limitation, as used in the claim and defined in the specification, "antistatic fabric" is broadly envisioned in the patent as a fabric which reduces or controls the amount of static electricity it generates. This interpretation is not necessarily limited to materials used solely for their antistatic properties. For example, carpets are cited in the patent as an antistatic fabric, yet carpets and many similar antistatic objects have purposes or uses beyond their antistatic properties. Thus, even though the military specifications for this camouflage do not address the issue of static control, and the camouflage may not have been used for its antistatic properties, the court finds that the camouflage may nonetheless have antistatic properties such that it may be considered an antistatic fabric for purposes of Claim 1. Moreover, even if the PVC acts as a total insulator such that the finished camouflage product is non-antistatic as defendant claims, the underlying greige cloth, if made up of antistatic yarns, may be an antistatic fabric and the addition of PVC does not negate that. Additionally, if the fabric insulated with PVC prevents the build up of static electricity it may be an "antistatic fabric."

#### b. "organic yarn"

■ The court finds that Claim 1 was not literally infringed for several reasons. First, Claim 1 requires that an "organic yarn" be combined with a "heterogeneous spun yarn." The evidence shows that the accused fabric is woven from a yarn blended from organic (polyester) and conductive (steel) fibers. This polyester/steel blended yarn comprises both the fill and the warp of the accused camouflage fabric. No purely organic yarn is used. Since no organic yarn is used in the accused products, the Mount Vernon polyester/steel camouflage does not contain every element of Claim 1. Claim 1, therefore, is not literally infringed. *London,* 946 F.2d at 1539 ("There can be no infringement as a matter of law if a claim limitation is totally missing from the accused device.").

Second, plaintiff argues that the amount of steel fibers in the polyester/steel blended yarn used at Mount Vernon is low compared to the amount of polyester fibers, such that the court should consider the polyester/steel blended yarn an organic yarn. According to plaintiff, this yarn blended from organic and conductive fibers would thereby satisfy the "organic yarn" limitation of Claim 1. However, as discussed earlier, "organic" as used in the specification and Claim 1 means "nonconductive." That is the only meaning that gives the "organic yarn" limitation any effect. To accept plaintiff's interpretation would be to ignore an explicit claim limitation. Under

plaintiff's interpretation, Claim 1 would have to be rewritten from an "organic yarn combined with heterogeneous spun yarn" to just "a heterogeneous spun yarn." *See infra* p. 540. The court cannot re-write the claim to find infringement.

■ Third, it is clear from the earlier discussion that the organic yarn requirement was meant to be something different from the heterogeneous yarn requirement. This is further illustrated in the specification where it describes 45 examples, 1–5 of which relate to heterogeneous conductive yarn and 6–45 of which relate to a carpet. In each of the examples illustrating a carpet, according to the invention, the carpet is composed of both heterogeneous and organic fibers. None of the examples describes using only heterogeneous fibers. It is not the court's place to analyze the necessity of any claim limitation; it cannot ignore an express limitation regardless of how unnecessary it was to patentability. Rather, the court's task is to determine whether every claim limitation is found in the accused infringing product. *See Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 (Fed.Cir.1987) (rejecting the "implic[ation] that specific claim limitations can be ignored as insignificant or immaterial in determining infringement."). Since the language of the claim and the specification make it clear that "organic yarn" is non-conductive and is something different from "heterogeneous yarn," the court cannot find that the "organic yarn" requirement of Claim 1 is satisfied by the polyester/steel blended yarn used at Mount Vernon. The evidence shows that the accused camouflage did not contain organic yarn not having at least some conductive fibers. Again, the court is not convinced that Claim 1 was literally infringed.

### c. "said conductive fibers radially migratorily clustered along the length of said heterogeneous spun yarn"

■ The next limitation is "said [heterogeneous] spun yarn comprising organic staple fibers and conductive staple fibers, said conductive fibers radially migratorily clustered along the length of said heterogeneous spun yarn." As discussed, the organic staple fibers and conductive staple fibers have been clearly defined in the specification and the evidence shows that the blended yarn manufactured at Mount Vernon and used in the accused camouflage comprise organic and conductive fibers as those terms are used in the claims. The issue is whether the blended yarn is heterogeneous and whether the conductive fibers are radially, migratorily clustered along the length of the yarn as those terms are used in the claims. While the court does not want to conflate the heterogeneous limitation and the clustering limitation, the two do go hand in hand. If the conductive fibers are clustered, it is more likely that the fibers are not evenly mixed. However, it would be possible for a yarn to be "heterogeneous" yet not exhibit clustering. Similarly, it could be possible for the yarn to exhibit clustering while at the same time be relatively homogeneous, if the clusters are distributed evenly, for example. Both limitations must be determined by visual examination.

Both parties presented experts or witnesses who photographed cross-sections of the polyester/steel yarn used to make the accused camouflage or the camouflage itself. Plaintiff presented Dr. Goswami who, with the help of technicians working under his supervision at the laboratories of the School of Textiles at Clemson University, examined two Mount Vernon yarn samples (PX 268 and PX 269, yarn samples 1 and 2, respectively). Dr. Goswami looked at the cross-section at various points along these samples to determine the distribution of steel fibers within the yarn. Specifically, Dr. Goswami testified that he used a table of random numbers (dimensionless numbers generated by random statistical calculations) in the selection of specimens from the yarn samples in order to remove any kind of a bias in selecting samples. In total, Dr. Goswami obtained 25 specimens from each of the two yarn samples.

For each of the specimens, Dr. Goswami obtained a longitudinal and a cross-sectional view of the yarn. Dr. Goswami obtained the longitudinal view of the specimens by placing a specimen of yarn on a microscope and flooding it with a liquid having a reflective index similar to polyester in order to render

the polyester fibers white or transparent. The steel fibers appeared dark. Dr. Goswami then took photographs of the slides. To obtain views of the cross-section of the yarn specimens, Dr. Goswami used a cross-section cutting technique developed some time ago at Textile Research Institute ("TRI"), and then encapsulated the cross-sections with a technique commonly used at the Clemson School of Textiles. Dr. Goswami observed these cross-sections through a microscope and photographed the slides, which show longitudinal and cross-sectional views of the two samples of yarn at various points along the yarn. In the longitudinal views the slightly dark fibers or black fibers are the steel and the brownish fibers are the polyester fibers. In the cross-sectional views the bright circles are the steel fibers whereas the circular fibers are the polyester fibers. The steel appears as bright spots while the polyester appears as small brown circles.

Dr. Goswami also examined a sample of the polyester/steel camouflage nets produced by Mount Vernon under three different contracts. In order to see the yarn structure within the nets, Dr. Goswami removed the outer PVC coating from the nets with a solvent. After removing the PVC layer, Dr. Goswami selected pieces of the fabric from various positions not covering the same warp or fill to get a random sampling. He placed the samples on microscope slides and flooded them with a liquid having the same refractive index as the polyester to enable him to see better the steel separate from the polyester. Pictures of these slides were also taken and identified by two sets of numbers on the bottom right-hand side. PX 402D. Again, the first number refers to the specimen and the second number refers to the fabric sample. These photographs show the warp and fill yarn as used in the fabric and do not show the cross-section of the yarn. Dr. Goswami testified that he did not take any cross-sectional samples of the actual camouflage since he had done that in connection with his examination of the yarn used to make the camouflage.

Defendant also presented photographs of the cross-sections of the accused camouflage material. Defendant presented Mr. William Tobin, a metallurgist with the Federal Bureau of Investigation, who had tested material taken from camouflage screens supplied under the A117, B007, and A060 contracts. Mr. Tobin, offered as an expert in the field of metallurgy and the analysis of materials containing metal, R. at 1906–07, performed tests to determine the spatial relationship of certain stainless steel fibers within a matrix of polyester fibers. *Id.* Mr. Tobin was given samples of camouflage from the three contracts—A117, B007, and A060. From these he randomly cut and labelled samples in the longitudinal and transverse directions for examination. Mr. Tobin took over fifty samples each having ten to fifteen yarn cross-sections. Mr. Tobin hardened the samples with a thermoplastic and, with the help of a scanning electron microscope, obtained pictures of the cross-section of the yarn in the camouflage samples. In the photographs of the cross-sections the stainless steel fibers appeared as bright dots.

Mr. Tobin examined the cross-sections of the samples to determine whether the stainless steel fibers were clustered or not using, what he called, a rotatable quadrant theory. If the stainless fibers appeared within a quadrant of the yarn cross-section, he considered them clustered. The quadrants were not fixed and could rotate so as to try to accommodate various stainless steel fibers. After examination of the samples he took, Mr. Tobin concluded that the steel fibers were clustered in only 12% of the yarn cross-sections.

None of the testimony by the experts and other witnesses was persuasive or dispositive on the issue of whether the steel fibers in the yarn were radially migratorily clustered. Not surprisingly, plaintiff found a high number of clustered fibers whereas defendant found a low number of clustered fibers. However, many of the samples, which defendant argued were not clustered, clearly appeared, upon examination by the court, to be clustered or grouped together; likewise, many of the samples plaintiff considered clustered were not grouped together in the sense of a "cluster" but had fibers distributed throughout the cross-section.

Upon the court's own careful examination of the evidence, including every photograph

of the accused yarn or accused camouflage provided by each party, testimony of all the witnesses, the military specifications, and Mount Vernon's manufacturing plan, it determines that plaintiff has failed to show that the steel fibers are "clustered" as that term is used in the claims, or for that matter that the fibers are "radially, migratorily clustered." While some of the cross-sections photographed by both parties show two or three steel fibers clustered together, the majority show the steel fibers spaced from each other. The conductive fibers, for the most part, are not grouped as shown in Figs. 4 and 5. More often than not the fibers appear over the entire yarn cross-section; individual fibers are spread throughout the cross-section and there is no discernable "cluster." Given that the number of specimens actually examined is small in relation to the amount of yarn used to make the accused camouflage and the great disparity between the clustering of steel fibers in each specimen, the court cannot say the steel fibers in the Mount Vernon polyester/steel yarn are clustered as that term is used in the Klein patent. In addition, even accepting as true plaintiff's contention that the photographs its expert took of the Mount Vernon polyester/steel yarn are representative of all the accused yarn, plaintiff has failed to show a significant number of specimens exhibiting clustering.

Moreover, while the steel fibers appear at different locations throughout the cross-sections of the yarn, plaintiffs have failed to show radial migration. Clearly, the fibers are in different spatial positions throughout the cross-sections, but plaintiff has not shown that "clusters" of fibers actually migrate.

### 2. Claim 3

■ Because Claim 3 depends from Claim 1, which is not infringed, Claim 3 is not infringed. In addition, plaintiff has failed to show that the conductive fiber contact of the yarn in the accused camouflage "is discontinuous at preselected distances" as required by Claim 3. Plaintiff did not adduce any evidence that Mount Vernon "preselected" a certain conductive fiber length or that it established its yarn making process to obtain any "preselected" discontinuities; plaintiff presented no evidence that Mount Vernon used a specific weight ratio (of conductive fibers to non-conductive fibers) or a blending and spinning process to obtain a specific range of conductivity lengths. To the contrary, the evidence shows that Mount Vernon used a breaker drawing to obtain random fiber lengths.

The only evidence plaintiff presents regarding "preselected" electrical contact lengths is a test performed by the inventor Mr. Klein. Mr. Klein ran approximately two miles of yarn through a conductivity testing device and calculated the average conductive length of the various conductive lengths in the yarn. Plaintiff argues simply that "Mr. Klein's test demonstrated that *numerous* portions of the length of each Mount Vernon polyester/steel yarn contain conductive fibers in electrical contact for preselected distances, with electrical discontinuities present between each two conductive lengths." (Emphasis added.) *See* PX 289–91. In reality, plaintiff's test accomplished nothing besides showing that the lengths of electrical conductivity varied throughout the yarn. While some of the conductive lengths may have been the same, overall the lengths varied greatly. This supports defendant's contention that the process used by Mount Vernon was intended to produce random lengths and plaintiff has failed to demonstrate any sort of "preselection."

### 3. Claim 16

■ The evidence shows that the lengths of electrostatic conductivity vary in the yarn produced by Mount Vernon. The distribution of steel fibers in the yarn was shown to be random. Plaintiff's own test showed that the average conductive length varied from two feet to eight feet. This is not conductivity over a "cyclic length." Moreover, this range of conductivity is much greater than any range of conductivity length mentioned in the specification. In the examples listed in the specification the range usually varied only ½ foot to a foot, and at the most four feet. Thus, the yarn produced at Mount Vernon is not continuously electrostatically conductive along a cyclic length thereof as Claim 16 requires and this claim is also not infringed. In addition, like Claim 1, the court finds that the fibers are not radially

migratorily clustered along the length of the yarn.

## B. The Doctrine of Equivalents

Plaintiff argues that, if not literally infringed, Claim 1 is infringed under the doctrine of equivalents. The Federal Circuit recently set forth the test for patent infringement under the doctrine of equivalents in *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512 (Fed.Cir.1995) (en banc). Relying on the landmark Supreme Court case, *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), the Federal Circuit acknowledged that the tri-partite *Graver Tank* test—that the accused product perform "substantially the same function in substantially the same way to achieve substantially the same result [as the claimed product]" when viewed from the perspective of a person with ordinary skill in the art—is still intact. *Hilton*, 62 F.3d at 1523. *See also London*, 946 F.2d at 1538. The function-way-result test has been refined by the Federal Circuit since *Graver Tank* to incorporate the *all elements rule* which states that an accused structure or process must contain equivalents of all the elements of the allegedly infringed patent. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–35 (Fed.Cir.1987) (en banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). The doctrine of equivalents was further refined in *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259 (Fed.Cir.1989) (explaining that although equivalents for every claim limitation must be found in the accused device or process, they need not be found in an exactly corresponding component).

Most recently, the Federal Circuit emphasized three points about the doctrine of equivalents. First, if the function-way-result test proves insufficient in determining whether an accused device infringes under the doctrine of equivalents, evidence of copying, designing-around, and independent research/development may be considered if relevant to the parties' cases. Second, the court emphasized that "infringement under the doctrine of equivalents is an issue of fact ... to be decided by the judge in a bench trial." Third, the decision to apply or not apply the doctrine of equivalents is not within the discretion of the trial judge in cases where literal infringement is not found—*i.e.*, application of the function-way-result test is mandatory unless literal infringement is present. *Hilton*, 62 F.3d at 1521–23.

According to plaintiff the only purpose the organic yarn serves is to complete the fabric. Since the heterogeneous yarn also completes the fabric, it performs the same function as the organic yarn and, therefore, says plaintiff, is its equivalent. Under plaintiff's analysis, anything satisfies the organic yarn requirement as claimed as long as it completes the fabric. However, plaintiff has failed to persuade the court that the only function of the organic yarn is to complete the structure. It appears from the specification that the organic yarn also has an antistatic function. A primary object of the invention is "to provide an antistatic fabric particularly adapted to carpets made by *combining continuous filament yarns* with a fine spun blended yarn that has short lengths of continuous electrostatic conductivity and whereby such a fabric functions to control static electricity and is not electrically dangerous." *Klein*, Col. 2, lines 49–54 (emphasis added). The specification further emphasizes the role the non-conductive yarn plays when it notes "that by the proper construction of a fine heterogeneous hybrid blended spun yarn made from conductive and non-conductive fibers and *combined with a carpet facing yarn*, a significant effect in control of the generation of static electricity can be achieved." *Klein*, Col. 10, lines 59–63 (emphasis added). Dr. Wagner, defendant's expert, gave credible testimony that using all heterogeneous yarn would not work the same way to control static electricity. A fabric made from all heterogeneous yarn creates a grid of conductive fibers which has a greater ohms per square than does a combination of organic yarn and heterogeneous yarn. Thus, the court cannot say that weaving a fabric from all heterogeneous yarn containing conductive fibers would be the same as weaving a fabric from organic (non-conductive fiber) yarn and heterogeneous yarn. In other words, the court cannot find that heterogeneous yarn containing conductive fibers is an

equivalent of organic yarn. This is especially true given that an express concern of the Klein patent was to ensure that the fabric was not electrically dangerous.

▮ The court notes that there are limitations to the doctrine of equivalents. *Loctite*, 781 F.2d at 870. "The doctrine has been 'judicially devised to do equity' in situations where there is no literal infringement but liability is nevertheless appropriate to prevent what is in essence a pirating of the patentee's invention." *Loctite*, 781 F.2d at 870 (quoting *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983)). In this case plaintiff has failed to show that equity dictates that the court impose liability in the absence of literal infringement. As was discussed earlier, Mount Vernon used a different process than the one described in the Klein patent. There is no evidence that Mount Vernon was trying to practice the claimed invention.[4] Indeed, Mount Vernon's manufacturing plan stated that its blending process would provide uniformly blended yarn. Moreover, Mount Vernon was not producing yarn for its antistatic properties. Nor did it intend it to be used for any antistatic properties. As discussed in connection with the Johansson patent, polyester/steel yarn was used solely for protection against radar detection and not because it would reduce the static electricity the fabric generated. In light of these distinctions, equity would not be served by applying the doctrine of equivalents to extend the claims of the '675 patent to include the accused fabric.

### III. *Validity.*

▮ The next issue the court faces is whether, having found non-infringement, it needs to consider the validity of the '675 patent. Defendant raised the issue of invalidity as a defense to plaintiff's allegations of

infringement. There has been much debate over whether a trial court and especially the Federal Circuit should consider patent validity if non-infringement is found. In certain respects, this debate culminated in the U.S. Supreme Court's decision in *Cardinal Chem. v. Morton Int'l, Inc.*, 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993).

Prior to the Supreme Court's decision in *Cardinal*, this court stated that it was unnecessary to decide validity in cases where there was no infringement. "Since there is no infringement, it is unnecessary to decide validity.... The patent has expired. There is no evidence of outstanding licenses which might be affected by a ruling on validity. There is no evidence that the patent is being litigated in any other court, and new suits are barred by 35 U.S.C. § 286." *Barrett v. United States*, 186 Ct.Cl. 210, 224 (1968). After establishment of this court, it has routinely declined to decide the issue of validity if non-infringement was found. *See Autogiro*, 181 Ct.Cl. at 92, 384 F.2d at 415 (stating that the determination of validity in that case was neither squarely raised nor served the public interest); *Gargoyles, Inc. v. United States*, 26 Cl.Ct. 1367, 1369 (1992) ("This court need consider the validity arguments only if infringement is found."). *But see Pacific Technica Corp. v. United States*, 11 Cl.Ct. 393, 405 (1986) ("Patent disputes in the United States Claims Court require the court to make determinations on both validity and infringement, regardless of the conclusion reached on either validity or infringement."). Prior to *Cardinal*, the Federal Circuit also followed the practice of vacating lower court determinations on validity, regardless of whether it found a patent valid or invalid, once that court affirmed a finding of non-infringement. *See e.g., Vieau v. Japax, Inc.*, 823 F.2d 1510, 1517 (Fed.Cir.1987); *Fonar Corp.*, 821 F.2d at 634.

---

4. Plaintiff tries to argue that Mount Vernon is practicing the invention of the Klein patent because it consulted with an employee of Bekaert, a yarn manufacturer and licensee under the Klein patent, on how to make yarn according to the Teledyne specifications. In the mid–1970s Brunswick sued Bekaert but ultimately settled. Bekaert received a license under the Klein patent. In arguing that Mount Vernon consulted

with Bekaert, a licensee under the Klein patent, on how to make a yarn according to the Teledyne specifications, plaintiff makes the jump that Bekaert must be teaching Mount Vernon the claimed invention. The court is unpersuaded. Plaintiff has failed to show that Mount Vernon was trying in any way to practice the invention or produce heterogeneous yarn.

In *Cardinal,* the Supreme Court restated its position in *Altvater v. Freeman,* 319 U.S. 359, 363–64, 63 S.Ct. 1115, 1117–18, 87 L.Ed. 1450 (1943), by disapproving of the Federal Circuit's practice of routinely vacating determinations of validity after finding non-infringement.

> Even if it may be good practice to decide no more than is necessary to determine an appeal, it is clear that the Federal Circuit had jurisdiction to review the declaratory judgment of invalidity. The case did not become moot when that Court [sic] affirmed the finding of noninfringement.... The Federal Circuit's practice is therefore neither compelled by our cases nor supported by the 'case or controversy' requirement of Article III."

*Cardinal,* 508 U.S. at 98–99, 113 S.Ct. at 1976. Nonetheless, there are several reasons why the Supreme Court's decision in *Cardinal* does not require this court to decide the issue of validity in this case. First, the Supreme Court made it clear that its ruling in *Cardinal* was limited to *counterclaims* challenging validity brought under the Declaratory Judgment Act. The Court specifically distinguished the case, such as here, where the issue of validity is raised only as an affirmative defense. It distinguished an earlier case, *Electrical Fittings Corp. v. Thomas & Betts Co.,* 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939), in which the Court had said that a defendant found to be infringing could demand that the appellate court vacate the finding of validity by stating that the issue of invalidity "was raised only as an affirmative defense to the charge that a presumptively valid patent had been infringed, not ... as a basis for a counterclaim seeking a declaratory judgment of patent invalidity." *Id.* 508 U.S. at 93, 113 S.Ct. at 1973. The Court further stated, "An unnecessary ruling on an affirmative defense is not the same as the necessary resolution of a counterclaim for a declaratory judgment." *Id.*

Quoting from an earlier decision, the Court noted and reaffirmed this distinction, "To hold a patent valid if it is not infringed is to decide a hypothetical case. But the situation in the present case is quite different. We have here not only a bill and answer but a counterclaim. Though the decision of non-infringement disposes of the bill and answer, it does not dispose of the counterclaim which raises the question of validity...." *Id.* 508 U.S. at 94, 113 S.Ct. at 1974 (quoting *Altvater,* 319 U.S. 359, 363–64, 63 S.Ct. 1115, 1117–18, 87 L.Ed. 1450 (1943)). Moreover, throughout its opinion, the Court continually refers to counterclaim or declaratory judgment, giving no rise to the inference that its opinion extends to affirmative defenses. The Court also reasons:

> It is equally clear that the Federal Circuit, even after affirming the finding of noninfringement, had *jurisdiction* to consider Morton's appeal from the declaratory judgment of invalidity. A party seeking a declaratory judgment of invalidity presents a claim independent of the patentee's charge of infringement. If the District Court has jurisdiction (*established independently from its jurisdiction over the patentee's charge of infringement*) to consider that claim, so does (barring any intervening events) the Federal Circuit.

*Id.* 508 U.S. at 96, 113 S.Ct. at 1975 (second emphasis added).

Secondly, the Court also makes clear that the issue decided "concerns the jurisdiction of an intermediate appellate court—not the jurisdiction of either a trial court or this court." *Id.* 508 U.S. at 95, 113 S.Ct. at 1974. The Court only stated that if a claim is properly before an appellate court, that court must decide it. It left to the trial court the determination of whether the issue of patent validity was properly before it.

Finally, the Supreme Court considered the public's interest in being able to rely on the finality of litigation impacting the patent system. The Court observed that the Federal Circuit's former practice injured the public interest in so far as it "denies the patentee such appellate review, prolongs the life of invalid patents, encourages endless litigation (or at least uncertainty) over the validity of outstanding patents, and thereby vitiates the rule announced in *Blonder–Tongue.*" *Id.* 508 U.S. at 102, 113 S.Ct. at 1978. The rule enunciated in *Blonder–Tongue Labs., Inc. v. University of Ill. Found.,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), not only

**558**

condemns wasteful relitigation of patent enforcement actions, but also estops a patentee from relitigating a determination of invalidity against another alleged infringer if invalidity was already decided in a fair trial. Further, Court noted that, in the absence of such a rule, there is a "danger that the opportunity to relitigate might, as a practical matter, grant monopoly privileges to the holders of invalid patents." *Id.* 508 U.S. at 101, 113 S.Ct. at 1977 (citing 402 U.S. at 338, 91 S.Ct. at 1447). In the present case, public policy does not dictate that the court decide the issue of validity. None of the dangers listed in *Cardinal* or *Blonder–Tongue* exist here. The '675 patent has expired, and the court does not know of any other pending litigation or existing, affected licenses. Further, defendant has failed to present evidence that clearly rebuts the presumption of patent validity. Finally, in light of *Cardinal,* this court has considered whether the issue of validity must be decided if it finds non-infringement and finds that *Cardinal* does not require the court to do so absent additional, compelling reasons.

### *The Johansson Patent*

Plaintiff, Brunswick, contends that camouflage screens manufactured by Teledyne and purchased by the government as well as camouflage screens purchased by Sioux Manufacturing Corporation ("Sioux") from Teledyne and provided to the government under these contracts infringe certain claims of the Sven–Goran Johansson patent (U.S. Patent No. 3,733,606) for "Camouflaging Means For Preventing Or Obstructing Detection By Radar Reconnaissance" ("Johansson patent," " '606 patent," or "Johansson '606"), to which Brunswick has an exclusive license.

This dispute surrounds the Army's procurement of optical and radar camouflage. Radar consists of very high frequency radio wave transmitters and receivers, which detect and range distant objects or phenomena. The radar transmitter and receiver are normally found in the form of two separate antennas contained within the same housing unit along with special circuitry used to quantify the transmissions and receptions. In order to protect air and land craft from being detected and destroyed, a variety of countermeasures, which are categorized as either passive or active, have been developed. Passive countermeasures merely reflect or echo the radar signal so as to prevent an accurate signal response. Typical examples of passive countermeasures are light metal strips (chaff), foil particles, and zinc-coated glass strips. Active countermeasures are of two types, jamming and deceptive. Jamming consists of high-power signals transmitted with disruptive amplitude or frequency variations in order to impair proper radar functioning, while active-deceptive countermeasures, which range widely in type, disrupt radar tracking or introduce false or multiple threats. The optical and radar camouflage screens involved in the case at bar are countermeasures of the active-deceptive type. The Johansson patent is perhaps best described by Claim 1:

1. Camouflage means for minimizing detection of objects by radar reconnaissance which comprises a multi-layered sheet of flexible material comprising a single electrically resistive layer and another layer of substantially insulating material, said electrically resistive layer being constituted by a thin inhomogeneous electrically conductive film having, at radio frequencies exceeding 2,000 MHz, a surface resistivity falling between a lower limit of 100 ohms and an upper limit of 1,000 ohms but considerably different from 377 ohms to ensure partial reflection from the object of at least 10 percent of the incident radar power.

In 1972, plaintiff bid for and received a Manufacturing Methods & Technology ("MM & T") contract from the Army to manufacture camouflage screens for military use. Brunswick spent the next years setting up and establishing an operating facility with a workable camouflage manufacturing line. In 1974, Brunswick obtained from Diab–Barracuda AB ("Barracuda"), a Swedish company, an exclusive license of the Johansson patent. As the exclusive licensee, Brunswick had to pay Barracuda royalties under a cost incentive arrangement. In 1972, after successfully completing the contract, Brunswick competitively-bid on and was awarded another contract to manufacture camouflage screens.

Subsequently Brunswick received sole source awards in 1975, 1977, 1979 and 1981. Portions of those contracts were set aside for award to a minority-owned small business. As a result, Brunswick formed Sioux Manufacturing as a joint venture corporation with the Devil's Lake Sioux Indian Tribe in Fort Totten, North Dakota, to receive those set-aside contracts. Sioux purchased its color-coated cloth used to make camouflage from Brunswick until 1989.

In 1983, the government issued another competitive solicitation which was awarded to Brunswick. In 1984, the Armed Services Committees of both chambers of Congress directed the Army to compete future awards in order to expand the industrial base and save money. As a result, plaintiff says the government arranged the next solicitation, in 1984, in a manner designed to prevent Brunswick from winning the entire award, thereby assuring establishment of a second source.

In 1984, the government issued another competitive solicitation for the manufacture of camouflage screens. This time a portion of this solicitation was awarded to Teledyne under the A117 contract. In 1985, Teledyne received another contract, the B007 contract, to manufacture camouflage screens. In 1986, the government awarded a minority set-aside contract, Contract No. DAAK01–86–C–C288 ("C288 contract"), for camouflage screens to Sioux. At this time, Brunswick was supplying Sioux with the color-coated base cloth used in its camouflage screens. Sioux began purchasing base cloth from Teledyne on February 17, 1989. PX 127, 132.

The government conducted another competitive solicitation in 1987. This time the government awarded a portion of the procurement to three different contractors. Teledyne received a portion under the A060 contract. Sioux received a portion under Contract No. DAAK01–87–A063 ("A063 contract"). And the third portion was awarded to Brunswick. In September 1989, the government gave Sioux permission to use Teledyne as its supplier of color coated cloth.[5]

The military prepared various specifications detailing the desired performance characteristics of camouflage screens systems. The initial version dated July 28, 1982, MIL–C–53004(ME), specified that the maximum power transmission through the color coated cloth be 15% with no minimum specified and that the cloths be tested at only one frequency, 10 GHz. On February 16, 1984, the Army amended the specifications, MIL–C–53004(ME), to require power transmission through the screens be between 10% and 20%, with testing conducted at three frequencies: 6 GHz, 10 GHz, and 17 GHz. The specification was again modified, MIL–C–53004A(ME), on August 9, 1985, to require testing at four frequencies: 6 GHz, 10 GHz, 17 GHz, and 35 GHz. The power transmission requirement, between 10% and 20%, which corresponds to 87 to 152 ohms or −10 to −7 dB,[6] remained the same. A power transmission of 20% corresponds to a surface impedance[7] of about 152 ohms. A power transmission of 10% corresponds to a surface

---

**5.** The Johansson patent expired on May 15, 1990. After expiration of the patent, the government awarded to Teledyne Contract No. DAAK01–90–C–0180 ("0180 contract") to manufacture camouflage screens for use in the conflict in the Middle East known as Operations Desert Shield and Desert Storm. Plaintiff contends these screens infringe the patent, even though the patent had expired by this time, because Teledyne would not have been able to satisfy this contract in time if not for its earlier infringement. Plaintiff asserts that if Teledyne was not infringing earlier, it would not have had the production capability to supply the Army with camouflage for Operation Desert Storm and that only Brunswick could have satisfied that contract.

**6.** The decibel (dB) is the logarithmic unit used to express power ratios. For instance, the ratio of power between reflected radar (P2) and transmitted radar (P1) can be expressed as: $dB = 10 \log_{10} (P_2/P_1)$. Decibels may also be used to express absolute values of quantities whose values may vary over a wide range, including power, radar cross-section, and antenna gain.

**7.** Resistance is determined in terms of surface *impedance*, a complex quantity with both an actual component and a theoretical component. Impedance determines the reflection and transmission characteristics of the material. Surface *resistance* (expressed in ohms per square or ohms) is the real component of surface impedance, while surface *reactance* is the theoretical (or imaginary) component. A layer of material is electrically resistive if its surface resistivity exceeds its surface reactance.

impedance of about 87 ohms. If the power transmission is below 10%, the surface impedance will be below 87 ohms. A transmission loss of 13 dB corresponds to a surface impedance of about 54 ohms. *See* DX 125.

Teledyne manufactured two different types of camouflage screens under these contracts. But all of the screens had certain aspects in common. The camouflage screens are generally comprised of three layers (trilaminate): a middle resistive layer and two outer optically camouflaging layers. The middle layer is a radar camouflaging layer consisting of a woven cloth of resistive fibers. The outer layers are two optical camouflaging layers consisting of color coated PVC. These outer layers are applied to the resistive layer and the combination is referred to as "color-coated cloth." These PVC layers have a top coat with fine particles in it to reduce gloss. The color coated cloth is incised and fixed onto a conventional net. The finished camouflage screens were provided in one of two shapes, hexagonal or rhombic. The difference between the two different types of screens manufactured by Teledyne was in the composition of the electrically resistive layer. At first, the base cloth forming the resistive layer of the camouflage screens was woven from a yarn blended from polyester and steel fibers (polyester/steel cloth), but later screens used a carbon base cloth.

Under the A117 contract Teledyne manufactured and delivered 60,000 camouflage screen systems to the government. DX 110, DX 265. A screen system included two camouflage screens (a hexagonal screen and a rhombic screen) and a screen repair kit. Teledyne started delivery for the A117 contract on January 15, 1986, and completed deliveries on August 21, 1987. DX 265, A117 contract, pp. 1, 4. The screen systems produced under the A117 contract included two camouflage screens of differing shape and a repair kit. The repair kit contained portions of incised color-coated cloth. The resistive layer of the screens produced under the A117 contract comprised a base cloth woven from yarns blended with polyester and steel fibers (polyester/steel yarn). The polyester/steel yarns and polyester/steel base cloths used by

Teledyne were manufactured by and supplied by Mount Vernon Mills ("Mount Vernon").

Although it was the first contract, the Army applied the amended version (MIL–C–530004(ME)) of its specification to the A117 contract. Under the amended version testing of the screens was required at three frequencies: approximately 6 GHz, 10 GHz, and 17 GHz. The power transmission through the color-coated cloth was to be between 10% and 20%.

Under the B007 contract Teledyne manufactured spare or replacement camouflage screens and repair kits for the screen systems made under the A117 contract. The screens provided under the B007 contract were made from the same polyester/steel base cloth manufactured under the A117 contract. Thus, the material for the B007 contract was essentially the same as the material for the A117 contract. Teledyne started shipment on the B007 contract under the first radar transmission requirements on November 1, 1985, and completed shipment on December 17, 1986. DX 265, B007 contract, delivery order ("DO") # 1, p. 6. Teledyne started shipment on the screens produced for the B007 contract according to the other set of radar transmission requirements on April 24, 1986, which it completed on November 13, 1987. DX 265, B007 contract, DO # 2, p. 4. A contract modification dated June 17, 1988, signed by a representative of Teledyne and the contracting officer states that the cloth manufactured for the A117 and B007 contracts (the same cloth was used for each) satisfactorily complied with the minimum requirements of the B007 contract regarding transmission. DX 110. This modification also states that the B007 contract contained a 10 GHz specification transmission requirement. The Army applied the initial version of the military specifications which required testing of the screens at only one frequency, approximately 10 GHz.

Under the A060 contract, 10,500 polyester/steel camouflage screens were procured. For the A060 contract, Teledyne revised its specifications for the polyester/steel yarn. Under the revised specifications, the diameter of the stainless steel fiber was reduced to 4.0 microns. At a later point during execu-

tion of the A060 contract, Teledyne again revised its specifications for the polyester/steel yarn reducing the weight of the steel fibers to 2.2% of the yarn. At still a later time, in the execution of the A060 contract Teledyne began to manufacture screens having a base cloth woven of polyester yarns, with no steel fibers blended into the yarn. These screens instead had graphite (carbon) fibers deposited on the polyester base cloth. The screens were then coated with PVC and are referred to as "carbon cloth."

For the first portion of the A060 contract, the Army required testing of the polyester/steel cloth screens at four frequencies, approximately 6 GHz, 10 GHz, 17 GHz, and 35 GHz. For the second and third portions, the Army required testing of the reformulated polyester/steel cloth screens and the carbon cloth screens at five radar frequencies, approximately 6 GHz, 10 GHz, 17 GHz, 35 GHz, and 94 GHz.

Teledyne started delivery for the first type of screens under the A060 contract on July 1, 1988, and completed delivery on October 20, 1989. DX 265, DO # 1. Teledyne started delivery on the second screens under the A060 contract on September 27, 1989, and completed delivery on November 30, 1990. DX 265, A060 contract, DO # 2. Delivery of the third screens under the A060 contract began on April 19, 1990 and was completed on December 20, 1991. DX 265, A060 contract, DO # 3. Army billing shows that under the A060 it received 11,000 units in 1988; 43,783 units in 1989; 25,217 units in 1990; and 0 units in 1991.

Under the C0128 contract, Teledyne supplied the government with desert camouflage screens for use in Operations Desert Shield and Desert Storm. The shield manufactured under this contract differed from those carbon cloth screens manufactured under the A060 in color only. Under the C288 and A063 contracts Sioux incorporated into its camouflage screens carbon cloth purchased from Teledyne, which Teledyne had manufactured under the A060 contract.

During performance of the A117 contract, the Army at Fort Belvoir tested the polyester/steel screens it received from Teledyne at the time it received them and found that they did not satisfy certain performance requirements of its specifications. The one-way transmission of the flat stock was supposed to be between 10% and 20%, which correspond to −10 dB and −7 dB, respectively. The Army reported to Teledyne by letter dated August 20, 1987, that according to its tests the screens had an average one-way transmission of −13 dB (approximately 50–60 ohms). *See* DX 107. In other words, the Army found the screens too reflective (the lower the number of decibels, the more reflective the screens—at 6 GHz, the value was −13 dB; at 10 GHz, the value was −13 dB; at 17 GHz, the value was −11 dB (74 ohms)). *See* DX 108, 107 and 103. The Army warned Teledyne in this letter that it would not accept any camouflage screens under the A117 contract and the newly awarded A060 contract until it could show that all contractual obligations would be met. An independent laboratory run by Georgia Tech also found that cloth had a one-way transmission of −13 dB. DX 108. A power transmission of 20% corresponds to a surface impedance of about 152 ohms. A power transmission of 10% corresponds to a surface impedance of about 87 ohms. If the power transmission is below 10%, the surface impedance will be below 87 ohms. A transmission loss of 13 dB corresponds to a surface impedance of about 54 ohms. *See* DX 125.

Because Teledyne represented to the Army that all of the screens met specification, the Army investigated Teledyne's testing procedures in order to determine the cause of the discrepancy. The Army found that Teledyne used a sheet of plastic to support the material during testing. While this plastic appeared to be radar transparent when measured separately, the Army believed that when in contact with camouflage material, it altered the transmissivity measurements of the material. When the Army ran tests with and without the plastic, it found that the plastic made the camouflage appear less reflective. The Army determined that the plastic could mistakenly lead Teledyne to believe that the camouflage was meeting specification. The Army then asked Georgia Tech to test this theory via computer modeling. Georgia Tech's results confirmed

562

that "when a dielectric material (plastic) is brought in contact with a physically thin dielectric material (flat stock), the apparent transmissivity of the thin material changes." DX 107.

Brunswick apparently heard rumors that the Teledyne screens did not meet specification and kept abreast of Teledyne's manufacturing methods. Brunswick conducted its own tests to determine the effect of using a plexiglass plate to test camouflage material and found that it incorrectly increased the resistivity results by 8%–9%. Brunswick communicated these results in several letters and in a report. In a letter to Congressman William Chappell dated June 6, 1987, Brunswick's president Mr. Herbert Ennis wrote asking for an investigation into the Army's testing procedures and records relating to Teledyne's materials. Brunswick reported that for some time it had "heard rumors and picked up comments indicating that the Teledyne material did not meet the specifications but, nevertheless, was being accepted by DCAS inspectors. It was indicated that this might have been done under some averaging method which is not consistent with the specifications." Brunswick also reported that it was suspicious because it had originally developed the process of incorporating metal fibers into woven scrim and had kept abreast to Teledyne's manufacturing methods. Brunswick stated that it continued to make samples according to Teledyne's procedure in order to test them and determine if they met Army specifications. According to Brunswick's tests, Teledyne's "process produces material which is out of range with respect to the original specifications, which covered an electrical range of frequency up to 17 GHz." Brunswick also reported that "It is highly probably [sic] that almost all of the Teledyne 60,000 [under the A117 contract] screen systems and almost an equivalent amount of spares [under the B007 contract] that have been shipped defective." See DX 112. A short paper dated June 25, 1987, and a graph showing radar frequency in GHz versus radar transparency in percent for Brunswick's camouflage and competition type finished

camouflage cloth were attached to this letter. According to the paper, Brunswick attempted to make screens according to Teledyne's procedures, and those screens when tested by Brunswick did not meet specification. As a result, Brunswick stated that it had strong reasons to believe that Teledyne's material followed this same trend. According to the graph attached, Brunswick's simulated Teledyne material had a transmission below 10% below 17 GHz and above 20% above 25 GHz, between 17 GHz and 25 GHz the material was within specification. The paper concluded by stating "Teledyne has produced and shipped approximately 60,000 screen systems which Brunswick believes do not meet the U.S. Army requirements."

In a letter to a Mr. Ralph Preston, dated July 29, 1987, Brunswick's president, Mr. Ennis, wrote that they had heard rumors that the Army tested the camouflage screens produced by Teledyne and found them not to meet the Army's specification while Teledyne claimed that they did meet specification. As a result, according to the letter, Brunswick "did some testing of [its] own materials by using thicker plastic materials placed over the horn [8] rather than the very thin films that are required to prevent dirt contamination. The test of our material showed significant increases in the order of 8%–9% in transmission by the addition of these thicker plastic films. If this same data is applied to the Teledyne type material, you can readily see how they can come up with test result data within the specifications." Mr. Ennis went on to write, "We have a strong feeling, therefore, that what has been happening during the past 2 years is that Teledyne has been deliberately cheating and altering their test results by use of an insertion of a thicker plastic material in their test set-up." See DX 113.

Prior to executing the contract modification regarding the A060 contract, the government prepared "Determination And Findings" dated June 3, 1988, in which it recommended making the contract modifications. PX 210. This document noted that

8. As used in the art of radar camouflage, "horn" refers to the portion of the radar apparatus that is mounted on the radar transmitter and receiver to collect or disperse the high frequency radio waves, respectively.

Fort Belvoir tested samples of Teledyne's cloth under the A060 contract and found that the cloth exceeded the specification transmission at 17 GHz by plus or minus 0.5 to 1.0 dB. These results were verified by the Georgia Technical Institute Engineering Center. Teledyne maintained that according to their tests the cloths met specification. The government noted in its Determination and Findings that Teledyne's findings were verified by an independent tester, Milimeter Wave, Inc. The Army concluded that the difference in test results was due to the testing procedures used by Teledyne. According to the Army, Teledyne's radar transmission readings included perturbations caused from random radar reflection in the Teledyne test stand/box. The Army also noted that a "review of the Teledyne software revealed compensation tables and parameters added to adjust for variation in stretch of the material during testing. These tables and parameters could skew the test stand reading such that a reading in excess of the 10–20% transmission limit would be read as being with the 10–20% limit." *See* PX 210. The army went on to note that Teledyne's testing was not testing for acceptance—that was to be done by the contractor. While not agreeing that its testing was deficient, Teledyne agreed to employ new test procedures. The Army found that the polyester/steel cloth from which the 10,500 polyester/steel screens under the A060 contract were to be made "is superior to the cloth used to make the screens accepted by the government under contract A117." The Army determined that it should accept on waiver, under the A060 contract, the 10,500 camouflage screens made from the reformulated stainless steel and 2,000 camouflage screens containing carbon fibers tested using Teledyne's current test standard in consideration for $90,000. The Army also determined it should change the current contract to call for 27,500 screens containing carbon fibers and the government's acceptance and retention of the 60,000 screens and spares provided under the A117 and B007 contracts. *See* PX 210.

Teledyne reformulated its polyester/steel blend levels to meet the higher frequency requirements specified in the A060 contract.

Teledyne revised its yarn specifications with Mount Vernon (Rev. A of Spec. 58527) to require polyester/steel yarn with 2.8% by weight steel. Teledyne intended to use the 2.8% polyester steel cloth in August of 1987, but decided to use a 2.2% by weight steel polyester/steel cloth and informed Mount Vernon of the change in October 1987. Teledyne submitted this redesigned cloth to the Army for certification, and the Army determined it was deficient at 17 GHz. DX 110. The Army found that the differences between their measurements and Teledyne's was due to the fact that the test standard built into the guidelines provided by Army's specification allowed the cloth to be tested "in the so-called 'near field.'" DX 110. The testing conducted in the near field allowed frequency perturbations. The Army was able to eliminate these perturbations in its measurements resulting in different test results. DX 110. By modification of the A060 contract dated June 17, 1988, and signed by a representative of Teledyne and the contracting officer, the Army agreed to accept 12,500 screens which have +/− 0.5 to 1.0 dB (which corresponds to about 9 ohms to 20 ohms in the region of 100 ohms) outside of the specification requirement on waiver in consideration for $900,000. DX 110. Of these 12,500 screens, 10,500 were to be produced using the reformulated polyester/steel yarn and 2,000 were to be produced using carbon deposition (carbon screens). DX 110. The modification also provided that the government would accept and retain the 60,000 camouflage screens provided under the A117 contract and would accept the 60,000 equivalent screen spares provided under the B007 contract. By way of the modification, Teledyne agreed to supply 27,500 carbon-based screen systems that satisfied the transmission requirements at five frequencies. A letter drafted, but never sent to Teledyne, indicates that the government originally was not going to grant the waiver because it thought that, based on Teledyne's proposed corrective action and reformulation of its color coated cloth, Teledyne would not be deviating from any contract requirements. *See* PX 149. However, we do not know why this was or what intervening events made the government decide to grant Teledyne's waiver.

Moreover, this letter was based on proposed manufacturing plans; it appears that at this point no samples were made or submitted. The contract modification (DX 110) indicates that Fort Belvoir actually tested samples of the cloth made under the new procedure and found them deficient at one frequency (17 GHz).

Plaintiff asserts that Millimeter Wave Technology performed exactly the same transmission test on Teledyne camouflage material as Teledyne performed in its lab. Plaintiff says that the tests performed by Millimeter were similar to the tests performed at Fort Belvoir and were agreed to by personnel at Fort Belvoir.

### I. *Claim Interpretation.*

■■■■■ Defendant asserts that the scope of the claims cannot be determined and that the claims are, therefore, indefinite. Under the second paragraph of 35 U.S.C. § 112, patent claims must particularly point out and distinctly claim the subject matter which the applicant regards as his invention. This is referred to as the definiteness requirement. If the claims are not sufficiently definite under § 112, they are invalid. The purpose of the definiteness requirement is to provide fair warning of what constitutes infringement. *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed.Cir.1991). Under § 112, the court must ascertain whether "the claims, read in light of the specification, reasonably apprise those skilled in the art" of the scope of the invention. *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1385 (Fed.Cir.1986). The claims need only be "as precise as the subject matter permits." *Hybritech,* 802 F.2d at 1385. "A decision as to whether a claim is invalid under this provision requires a determination whether those skilled in the art would understand what is claimed." *Amgen, Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200, 1217 (Fed.Cir.1991), *cert. denied,* 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991). "The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention." *Markman,* 52 F.3d at 979. The description may also define the terminology

used in the claims. *In re Vogel,* 422 F.2d 438, 441 (CCPA 1970). Further, claims must always be read in view of the specifications. *Markman,* 52 F.3d at 979. The court will address defendant's arguments regarding indefiniteness as they arise during the court's determination of the scope and meaning of the claims.

The invention defined in Claim 1 is a "Camouflage means for minimizing detection of objects by radar reconnaissance." By its own terms, therefore, Claim 1 relates to something which minimizes the detection of an object by radar. The camouflage according to Claim 1 "comprises a multi-layered sheet of flexible material...." A review of the specification reveals that the terms, multi-layered and flexible, should be given their ordinary meaning. "Multi-layered" simply means more than one layer as shown in Fig. 1 and described throughout the specification. The ordinary meaning of "flexible" is something which is not rigid or capable of being bent or flexed. WEBSTER'S II DICTIONARY (1988) at 487. This is consistent with the prosecution history wherein the term "flexible" was described as meaning pliable.

■■■■■ According to Claim 1, the multi-layered sheet is comprised of "a single electrically resistive layer and another layer of substantially insulating material...." Resistivity is defined in the specification as "the electrical resistance of the surface of a layer of a material, measured between the opposite sides of a square area thereof on the surface. The resistance value in ohms *i.e.* ohms per square is independent of the size of the square and the thickness of the layer." Col. 4, lines 25–30. The court agrees with plaintiff that the word "single" indicates that only one electrically resistive layer is intended. As to the substantially insulating layer, the parties agree that an insulating material is a dielectric or something without appreciable conductivity. R. at 1118–19, 2721. The use of the term "substantially" indicates, contrary to defendant's arguments, that while "another layer" should be mostly insulating it may have some conductivity. This is confirmed in the specification at Col. 5, lines 19–20, where it is stated that the outer layer may be slightly conductive.

Claim 1 further specifies that the "electrically resistive layer be constituted by a thin inhomogeneous electrically conductive film...." An electrically conductive film is a film having some electrical conductivity. R. at 1120–21. While the specification does not define "thin," it does say that the camouflage should be lightweight and flexible. During the prosecution of the Johansson patent, thin was described as 1 mm or 0.6 mm. *See* PX 2, Prosecution History at 46. Similarly, Drs. Thiele and Moore agreed that one skilled in the art would interpret thin as used in Claim 1 to mean 10 millimeters or less. R. at 1119–20.

■ According to Claim 1 the electrically conductive film is also "inhomogeneous." The parties dispute the meaning of this term. Plaintiff argues that inhomogeneous means a mixture of two dissimilar materials, R. at 1033, or stated another way, that the film's structure varies from point to point. R. at 1120. Plaintiff's definition is supported by two reputable electromagnetic textbooks.[9] While the specification does not define "inhomogeneous," nothing in the claims, specification or prosecution history indicates that anything other than its ordinary meaning is appropriate. Indeed, the structure of the film described in the specification varies from point to point. For example, in Col. 5, lines 25–28, the intermediate, electrically conductive layer is described as including "metal fibrils [ ] or metallized fibers of synthetic material which are irregularly distributed in a solid or in a non-woven fabric such as so-called needle felt." This is a mixture of two dissimilar materials. Further, an example is given in Col. 6, and Fig. 2C, of an electrically conductive layer having holes or pores. Again the structure of this layer varies from point to point. The claims also bear out the appropriateness of this definition of inhomogeneous. Claim 4 describes a film which is "an extremely fine metal film exhibiting pores and apertures"; Claim 6 describes the electrically conductive film as a "conductive metallic grid"; and Claim 9 describes a film

"composed of finely distributed conductive particles." The remaining claims similarly relate to a film having a structure which varies from point to point. Thus, the claims and the specification support the plain and ordinary definition of inhomogeneous put forth by plaintiff. The court, therefore, finds that inhomogeneous means a mixture of two dissimilar materials or a material whose structure varies from point to point.

■ Defendant argues that the meaning of inhomogeneous is unclear and, therefore, indefinite under § 112. Defendant points out that the specification states that when the electrically resistive layer is made from a metal coating it "may be inhomogeneous so that uncoated areas, fissures and pores may remain and even may be desirable for purposes of the present invention." Col. 3, lines 5–8. Rather than refuting that the "inhomogeneous" material described in this passage is a material having a structure which varies from point to point, defendant contends that this passage of the specification implies that inhomogeneity is an optional aspect of the invention and that the claim is, therefore, indefinite. The court is dumbfounded by the frivolity of this argument. Even if this passage were to imply that inhomogeneity is only a preferred, not a necessary, characteristic of the invention as defendant suggests, the court cannot fathom how defendant could seriously contend that Johansson was thereby not allowed to claim this preferred embodiment of the invention or that the meaning of inhomogeneous is somehow not clear. The meaning of this passage is entirely clear—an inhomogeneous material may have pores and fissures. Defendant's indefiniteness argument in this regard is wholly without merit.

■ Defendant also argues that the term "inhomogeneous" in Claim 1 is unclear when considered in conjunction with Claim 9 which depends from Claim 1 and specifies that the conductive film is also "approximately uniform." According to defendant, a

---

9. The Polonus textbook, PX 444B at 32, defines homogeneous as a medium whose "physical characteristics (mass, density, molecular structure, etc.) do not vary from point to point. If the medium is not homogeneous, it may be described as inhomogeneous." R. at 1121–22. According to the Kraus textbook, PX 444C, "a medium is homogeneous if its physical characteristics do not vary from point to point in the medium." R. at 1122–23.

film cannot be both inhomogeneous and approximately uniform. The court disagrees. The structure of the conductive film may vary such that it is inhomogeneous, but it may vary in a uniform manner such that it is approximately uniform. For example, a material may have particles embedded throughout making it inhomogeneous; yet those particles may be dispersed uniformly making it approximately uniform. These terms are not unclear or inconsistent. Both the court appointed expert and plaintiff's expert agreed that one of ordinary skill in the art would *not* find these terms inconsistent and would understand that a material could be both inhomogeneous and approximately uniform.

■ Claim 1 also requires the electrically conductive film have a specific range of surface resistivities "at radio frequencies exceeding 2,000 MHz...." Defendant objects to the adequacy of this frequency statement for many reasons, but defendant's main objection stems from the lack of an upper limit on frequency. Defendant argues that the power transmission and reflection characteristics of many materials change with frequency. Since the surface resistivity of a material is related to its transmission and reflection characteristics, the surface resistivity of a material could vary with frequency as well, says defendant. Since the specification states that the camouflage should have broadband characteristics, defendant contends that the surface resistivity requirement of Claim 1 should be satisfied at all frequencies above 2,000 MHz. As a result, in order to determine whether this limitation is satisfied, defendant argues the surface resistivity should be averaged over a range of frequencies. Since an upper limit on frequency was not provided, defendant contends that one skilled in the art would be confused about what range of frequencies to average over and would not know what is covered by Claim 1. Claim 1, therefore, is indefinite, says defendant.

Claim 1 does not contain an upper limit on frequency. A frequency range, 2 to 20 GHz (and additionally 1 to 20 GHz), however, is clearly described in the specification, Col. 6, line 11 and Col. 8, lines 21–22, and this frequency range was provided during the prosecution of the patent. That Johansson chose not to limit this claim by providing an upper frequency limit does not necessarily render the claim indefinite. A patent applicant obviously desires the broadest coverage the prior art allows. The court cannot impose a requirement that an applicant needlessly limit himself. If the scope and meaning of the claim is clear and definite, it was not improper for Johansson to anticipate that in the future radar reconnaissance may be conducted at higher frequencies and try to get broader coverage to account for that possibility.

The need for an upper limit on frequency arises only because defendant argues that the claimed surface resistivity should be an average surface resistivity over a range of frequencies. This averaging requirement, however, is not supported by the claims or the specification. Claim 1 does not specify an average surface resistivity. The specification neither mentions nor suggests averaging the surface resistivity over a range of frequencies. In addition, defendant has failed to produce conclusive evidence showing that it was common practice of those skilled in the art to average resistivity over a frequency range. The court cannot read a limitation into the claim, either from the specification or elsewhere, where one does not exist. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir. 1988). *See also Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 (Fed.Cir.1987).

Defendant's objection to this portion of Claim 1 stems from the fact that the resistivity of a material may vary with frequency. Because of this variability, defendant says it is possible that a material which does come within the scope of the resistivity requirement of Claim 1 at 2 GHz may not at 20 GHz. Thus, an infringing screen could become non-infringing, argues defendant. It is true that, in general, the resistivity of a material may vary with frequency, and it may be hard to satisfy the resistivity requirement of Claim 1 at every single frequency over 2,000 MHz. *See Report of Court–Appointed Expert, Dwight L. Jaggard, Ph.D.* at

17. Claim 1, however, does not specify that the material have a certain resistivity at "all" frequencies above 20,000 MHz, rather it states, "at radio frequencies exceeding 20,000 MHz." This requirement only makes sense if those frequencies are the frequencies where radar threats are located. Indeed, the purpose of the Johansson patent was to provide a camouflage that would minimize detection of objects by radar. The frequencies of concern would, therefore, naturally be the frequencies at which radar was commonly used. Since it would be impossible to test a material at every frequency above 20,000 MHz, one of ordinary skill in the art would know to test the material at the frequencies where radar threats were located.

This finding is supported by credible testimony of the experts and other evidence showing that one of ordinary skill in the art would have known that the camouflage should be tested at frequencies where radar threats were located. The evidence shows that it was common practice in the art only to test material at only those few frequencies where radar threats are located. The Army did not require testing at all frequencies. In 1976, the Army's military specifications only required testing at one frequency, and later, in 1984, required testing at three frequencies. The Army only required testing of the camouflage purchased from Teledyne at one frequency. This indicates that one skilled in the art would be able to evaluate the effectiveness of camouflage without averaging resistivity over a range of frequencies. The specification reports tests being performed at a frequency around 9 MHz. R. at 1124–25. In addition, both Drs. Thiele and Jaggard testified that one skilled in the art would know what frequencies the threat of radar occurs and would know to take measurements at those frequencies.

Moreover, it appears that in this case the resistivity of the conductive film will not change much with frequency. Indeed, the camouflage described in Johansson was designed such that its resistivity would not change much with frequency. Defendant's expert admitted that the dominantly resistive material discussed in the Johansson patent will have a broadband response and that its properties "should not change too much across the band width." Thus, the material described in the Johansson patent should have a broadband response and should not change much with frequency.

The claimed invention covers camouflage to prevent detection by radar. Those skilled in the art know what radar range is usually used for detection and would know that they are making or using the invention if it worked at a particular frequency above 2 GHz where a radar threat is located. Thus, the court finds that that limitation is not indefinite; one skilled in the art would know its bounds.

■■■ Defendant argues that "the phrase 'at radio frequencies exceeding 2,000 MHz' could have been worded more carefully" and cites to foreign counterpart patents which specify upper and lower limits in the claims. That claims in foreign counterparts contain the upper limits on frequency has absolutely no bearing on whether such limits are necessary in this case. "We need not even consider the actions taken in foreign countries with regard to the patentability of this application under our law." *In re Dulberg,* 472 F.2d 1394, 1398 (CCPA1973); *Medtronic, Inc. v. Daig Corp.,* 789 F.2d 903, 907–08 (Fed.Cir. 1986) (stating that "[t]he patent laws of the United States are the laws governing a determination of obviousness/nonobviousness of a United States patent in a federal court" in disallowing reliance on foreign counterpart), *cert. denied,* 479 U.S. 931, 107 S.Ct. 402, 93 L.Ed.2d 355 (1986). Foreign countries have different patent laws; there may have been many reasons why the claims prosecuted in another country may have been more limited. On the other hand, other U.S. patents and prior art are appropriate for assisting the court in determining how one of ordinary skill in the art would construe the language in a claim. *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1118 (Fed.Cir.1985) (en banc). An examination of the prior art supports the finding that one of ordinary skill in the art would know how to measure resistivity and the frequency at which to measure it without a specified frequency range. Although a certain resistivity was claimed in the Clough patent, no precise frequency

range was claimed. The only claimed reference to frequency was the statement "electromagnetic radiation in the range of wavelengths used for radar." *See* PX 64. The same holds true for the Rosenthal '397, Wesch '680, Walker '013, and Stander '210 patents. *See* PX 69, 62, 60, and 77.

 Defendant also argues that this language in Claim 1 specifying a surface resistivity at or above a certain radio frequency is inconsistent with the specification. Surface resistivity may be determined by making either a radio-frequency ("RF") measurement or direct-current ("DC") measurement.[10] Defendant argues the language of Claim 1 indicates that surface resistivity should be measured with an RF technique while the specification indicates that surface resistivity could be measured using a DC method. Defendant cites to the specification where it states, "Generally speaking [surface resistivity] is the electrical resistance of the surface of a layer of a material, measured between the opposite sides of a square area thereof on the surface. The resistance value in ohms *i.e.* ohms per square is independent of the size of the square and the thickness of the layer." According to defendant "[t]his definition suggests that a DC measurement is *sufficient* to characterize impedance." Defendant then cites 37 C.F.R. § 1.75(d)(1), which provides that "The claim or claims must conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description." Defendant argues that one of ordinary skill in the art would look to Col. 4 of the specification and conclude that surface resistivity *could* be measured with a DC method as opposed to an RF method. According to defendant a DC and an RF measurement could produce different results. Thus, says defendant, one of ordinary skill in the art would be confused as to how to measure resistivity.

Contrary to defendant's argument, the court finds nothing in the claims or specification that indicates one of ordinary skill in the art would be in any way confused as to how to measure surface resistivity or that the claims are contrary to the specification. The passage cited by defendant which "suggests" that a DC measurement "could" be used is represented in the specification as a standard textbook definition of surface resistivity. The court appointed expert, Dr. Jaggard, confirmed that this is indeed the standard textbook definition of surface resistivity and that its meaning is entirely clear. Defendant admits that because Claim 1 recites a radio frequency it suggests measuring surface resistivity with an RF technique. Defendant, however, conveniently ignores similar suggestions in the specification. For example, at Col. 8, line 22 a frequency range of 2 to 20 GHz is provided. The experiments described in Col. 7 were reportedly carried out at 9 GHz. Likewise, the experiment described in Col. 8 was carried out at 9.2 GHz. Thus, the teaching of measuring surface resistivity with an RF technique is found throughout the specification. The specification and the claims are clear and consistent on this point.

The court's position that one of ordinary skill in art would know to measure resistivity using an RF technique is supported by the report filed by the court appointed expert and the testimony of plaintiff's expert Dr. Thiele. The court appointed expert found that the meaning of surface resistivity and surface impedance is clear in the specification. He stated that one of ordinary skill in the art would know that an RF measurement at the frequency of operation is needed when considering the properties of impedance sheets or layers. According to Dr. Jaggard, DC surface resistivity measurements would be useless. The court finds that the meaning of surface resistivity as provided in the specification to be clear in the specification and that one of ordinary skill in the art would know from reading the specification and the claims that surface resistivity should be measured using an RF technique at the frequencies where radar threat is located.

---

10. Direct current is "electric current which flows in one direction only, as opposed to alternating current." Alternating current is "electric current that reverses direction periodically, usually many times per second." *See Joint Stipulation of Terms.*

Defendant also argues that without an upper limit on frequency a person of ordinary skill in the art would not understand what Claims 5 and 8 cover. Claims 5 and 8 refer to apertures having "dimensions which are negligible with respect to one quarter of the wavelength of the radar signals." According to defendant, as the frequency increases the wavelength decreases; thus, the dimensions would have to become smaller and smaller to remain negligible with respect to one quarter of the wavelength. Because a dimension could thereby be considered negligible with respect to ¼ wavelength at 20 GHz but not at 40 GHz, defendant argues a person of ordinary skill in the art would not understand the scope of Claims 5 and 8 in the absence of an upper limit on frequency. Interestingly, defendant does not explain how placing an upper limit on frequency solves this perceived problem.

Similarly, defendant argues that the scope of Claims 10, 13, and 14 may be unclear depending on how the phrase "the radar signals" is construed. Claim 10 specifies that the electrically conductive film of Claim 1 comprises short, unspun, unwoven fibers the majority of which "has a length which is not negligible with respect to one quarter of the wavelength of the radar signals." Claim 13 specifies that the flexible material of Claim 1 has a plurality of cuts, "the length of each cut exceeding one quarter of the wavelength of the radar signals." Claim 14 specifies that the cuts of Claim 13 "have their greatest dimension exceeding a half wavelength of the radar signals which have a frequency higher that 2,000 MHz." Again, defendant argues that because of the what is or what is not negligible with respect to a wavelength differs at 2 and 20 MHz, one of ordinary skill in the art would not know what materials are covered because of the absence of an upper limit on frequency. And, again defendant fails to explain what effect an upper limit on frequency would have.

Defendant's arguments with respect to these dependant claims actually support the interpretation that resistivity is determined at the frequencies where radar threat is located rather than defendant's position that a frequency range should have been given.

This interpretation gives effect to the limitations in these claims. Since one of ordinary skill in the art knows the frequencies commonly used with radar, that person could determine whether the dimensions in Claims 5 and 8 are negligible with respect to ¼ wavelength, or in the case of Claim 13, not negligible at those frequencies.

Defendant also objects to the frequency requirement based on the phrase "inhomogeneous" in Claim 1 and the phrase "approximately uniform" in Claim 9. Claim 9 depends from Claim 1 and states that "said electrically conductive film is *approximately uniform.*" (Emphasis added.) Defendant argues that the failure to provide an upper frequency limit renders these claims indefinite. Defendant's expert, Dr. Moore testified that inhomogeneous and approximately uniform have opposing meanings and that one of ordinary skill in the art would not understand them without knowing the highest frequency involved in the radar. R. at 2486–87. Dr. Moore testified that "inhomogeneous" and "approximately uniform" should be interpreted in an electrical sense. According to Dr. Moore, "approximately uniform" implies that the electric field does not vary very much over the particulates and would be interpreted in terms of the frequency involved; and inhomogeneous means it is wavelength dependant. R. at 3289–90. (*See* DX 55, 95). Dr. Moore argues that if the upper frequency limit is not known, one cannot determine whether the structure is homogeneous or inhomogeneous. R. at 3289–91. Nothing in the claims, specification, or prosecution history supports defendant's electrical definition of inhomogeneous. Moreover, as discussed earlier, the court agrees with Drs. Thiele's and Jaggard's testimony that inhomogeneous and approximately uniform are not inconsistent—something can be inhomogeneous such that its structure varies from point to point but do so in a uniform manner.

The court also finds the testimony of Dr. Moore on this matter not credible because at trial he cited to the McGraw-Hill Dictionary of Scientific Terminology and admitted that the definition for the term "inhomogeneous," which would be used by any

person of ordinary skill in the art in interpreting the Johansson patent, would refer to "two dissimilar materials" or materials "not uniform in structure or composition." R. at 2821–22. Dr. Moore further admitted that in a report he prepared for defendant in connection with this case he stated that "inhomogeneous" refers to the conductive film as being composed of at least two different material types. It was only later, to render the frequency requirement unclear, that defendant sought to offer this second definition of "inhomogeneous" based on a material's electrical properties. However, the meaning of "inhomogeneous" and the frequency requirement is clear and defendant's attempts to render them unclear are not supported by the claims, specification or other evidence.

▮ Another limitation of Claim 1 is that the electrically conductive film has a surface resistivity between 100 and 1,000 ohms but considerably different from 377 ohms. This limitation means exactly what it says. The lower limit on resistivity is 100 ohms and the upper is 1,000 ohms. It must also be "considerably" different from 377. The specification provides guidance as to what is "considerably" different. For example, according to the specification, 220 and 640 ohms are considerably different from 377 ohms, the characteristic impedance of free space. Dependent Claims 2 and 3 further limit Claim 1 to resistivity values of 220 ohms and 640 ohms, respectively.

Defendant objects to this limitation because it is based on a technical misunderstanding of the radar absorption and reflection properties of a material having a resistivity of 377 ohms, the characteristic resistivity of free space. According to the specification when the resistivity of the camouflaging material matches that of free space (377 ohms) all radar will be absorbed and none will be reflected. Col. 4, lines 35–38. However, all experts agree that Johansson was mistaken in this respect and that a material having a resistivity of 377 ohms would produce a voltage reflection and an incident power reflection of approximately 33% and 11%, respectively. The experts further agreed that one of ordinary

skill in the art would recognize this as an incorrect model just as they did. Defendant contends that this misunderstanding renders the claim indefinite.

▮ According to defendant's expert, one of ordinary skill in the art would not be put on notice as to what was covered by the claim because "he would wonder why 377 were excluded." R. at 2484–85. A claim is not rendered indefinite, however, merely because someone may not know why a limitation is included if that person can understand the bounds of the limitation. Definiteness does not necessarily require that there be a reason for a limitation, only that one of ordinary skill in the art understands what is claimed. As in this case, a claim limitation may be based on a technical misunderstanding. A patent may be valid and enforceable even if the specification describes why the invention works using a theory that is not correct or understood, so long as the patent teaches how to "achieve the claimed result." *Newman v. Quigg*, 877 F.2d 1575, 1581–82 (Fed.Cir.1989). If one of ordinary skill in the art correctly understands the scope and meaning of the limitation, it is not indefinite. This is especially true in a case such as this one where that technical misunderstanding is obvious to one of ordinary skill in the art. In this case, the specification is clear as to what ranges are excluded from coverage, and one of ordinary skill in the art would know the scope of the claim.

Moreover, defendant is incorrect in its assertion that one would not understand why the range around 377 ohms was excluded. One of ordinary skill in the art would understand from the specification that one of the goals of the invention was to provide a camouflage which reflected some incident radar. Since the inventor erroneously believed that a material having a resistivity of 377 ohms would not return any incident radar, that resistivity value was excluded from the claims. That Johansson was incorrect or that Claim 1 was unnecessarily limited does not render it unclear or indefinite. The claims are read in view of the specification. One of ordinary skill in the art after reading the specification would understand why the

range was excluded and what the claims covered.

■ Finally, Claim 1 requires that the electrically conductive film have "a surface resistivity falling between a lower limit of 100 ohms and an upper limit of 1,000 ohms but considerably different from 377 ohms *to ensure partial reflection from the object of at least 10% of the incident radar power.*" This limitation has been exhaustively debated and a significant portion of the trial was expended arguing the meaning of this limitation. Defendant argues this portion of the claim is indefinite because the claim fails to identify the object and is contrary to the specification. Alternatively, defendant argues that if the court finds the limitation to be definite, it should be interpreted as requiring the screen and not the object to reflect 10% of the incident radar power. Plaintiff, on the other hand, argues that the claim is definite and at times appears to argue it should be interpreted to require 10% reflection from the object only, and at other times admits the reflection is a summation of reflection from the object and screen.

To understand the parties' arguments in this regard it is helpful to look at what happens when radar strikes a camouflaged object. When radar is directed at a camouflaged object some of the radar is immediately reflected back from the camouflage screen itself, some is absorbed in the screen, and some passes through the screen to the object. The radar which passes through the screen to the object may then be reflected off the object in various directions depending on the shape of the object. Some of the radar reflecting off the object may pass back through the screen. Consequently, the radar returned to the radar source comes from two sources: (1) the radar reflected from the screen itself, and (2) the radar which passes through the screen, is reflected off of the object and passes back through the screen.[11]

It is not exactly clear what plaintiff is arguing this limitation should mean. Plaintiff argues that the last provision of Claim 1 refers "*to the energy which passes through the camouflage to the object and back through the camouflage material again,*" and repeatedly stresses that the reflection is from the object. Thus, it appears plaintiff is arguing that the reflection requirement should be interpreted to mean that 10% of the incident radar should be reflected from the object itself and should not include reflection from the screen. On the other hand, plaintiff admits at times that the reflection is from the camouflaged object and that the reflection is a summation of reflection from the target and the screen material. Defendant argues that the 10% limitation should be interpreted as meaning the camouflage screen should reflect 10% of the incident radar power and that the reflection from the object should not be included. The court finds that according to the claims and specification the reflection referred to in Claim 1 is the reflection from the camouflaged object, *i.e.,* reflection from the object as well as reflection from the screen; and that the parties' arguments over the meaning of this limitation has been "much ado about nothing" since both agree that the reflection includes the reflection from the screen (although plaintiff is not always entirely clear and consistent on this point, it did admit several times that the reflection included both the reflection from the screen and object). The question of whether that reflection also includes reflection from the object can and will be easily addressed. The parties' arguments in regard to this limitation really boil down to a dispute as to how one should *determine* whether the reflection limi-

11. The court recognizes that this is a simplified depiction of the radar interaction between the object and the camouflage screen. Many secondary reflections may occur and may contribute to the overall radar returned to the source. For example, the screen is comprised of multiple layers and some of the radar may be reflected back and forth between these layers, and possibly back to the radar source. In addition, some of the radar reflected from the object may be reflected back to the object by the camouflage screen; that radar may then again be reflected off of the object some of which may pass through the screen and some of which may again be reflected back to the object. The radar may in this fashion continue to reflect back and forth between the screen and the object until it is dissipated. These secondary reflections and absorptions, however, are generally not significant compared to the initial radar reflection from the screen and the object.

tation is satisfied and not as to what the limitation means. The court will address those arguments after it analyzes the meaning of the limitation.

Claim 1 specifies that the conductive film must have a certain resistivity "to ensure partial reflection from the object of at least 10 percent of the incident radar power." Incident, as the term is used in physics, is defined as "falling upon" or "striking." WEBSTER'S II DICTIONARY (1988) at 618. Claim 1 refers to a reflection of the radar power falling upon or actually reaching the camouflaged object.

Claim 1 specifically recites "reflection from the object," which suggests that the reflection may include reflection off the object itself. Since Claim 1, by its own terms, relates to a camouflage for minimizing the detection of objects and in practice the object is covered by the camouflage, the object referred to in the last portion of Claim 1 should be interpreted to mean the camouflaged object. Under such an interpretation the reflection would include reflection from the screen as well as from the object. That the claim is referring to a camouflaged object is also born out by claim language specifying that the resistive layer ensures a reflection from the object. The only time the screen can ensure reflection from the object is when it is deployed over the object. It is true that if the screen itself reflects 10% of the incident radar power, it will "ensure" a 10% reflection from the object, but that does not mean that reflection from the object is not included. The claim also literally covers the situation where the screen may not reflect 10% itself but that when combined with the reflection from the object, 10% is obtained.

This interpretation is supported by and gives meaning to the dependent claims. Defendant admits that its interpretation, that the 10% reflection is from the screen only and does not include the reflection from the object, renders many of the dependent claims meaningless. For example, Claim 3 which depends from Claim 1 further limits the resistivity of electrically conductive film to about 640 ohms. As the experts agree, a camouflage layer having a surface resistivity of 640 ohms could not reflect 10% of the incident radar power. Thus, if the reflection requirement does not include reflection from the screen, Claim 3 is meaningless. Likewise, under defendant's interpretation, the 1,000 ohm limitation in Claim 1 is rendered meaningless, because a 1,000 ohm screen could also never reflect 10%. The court's interpretation, that the reflection includes reflection from the screen as well as reflection from the object, however, gives meaning to all the claims and all the terms in the claims. Such an interpretation, which can reconcile and give meaning to all the terms in a claim, is more favorable than an interpretation that renders terms inconsistent or ambiguous or entirely fails to account for all the terms within a claim.

Defendant admits that its interpretation of Claim 1, that the 10% reflection is from the screen only, requires rewriting the claims and rendering some claims meaningless. As defendant says, it had to ignore the words "from the object" in Claim 1. The court cannot ignore words in the claims or rewrite the claims to provide for reflection from the screen only.

Since the claims must read in view of the specification, defendant turns to the specification in support of its interpretation. The only explicit mention made in the specification concerning the "ten percent reflection" is a statement that "[t]he *camouflaging material* should reflect at least 10 percent of the incident radar power...." Col. 4, lines 39–40 (emphasis added). Because the specification refers to a 10% reflection from the camouflage screen and the claim recites a 10% partial reflection from the object, defendant argues the claim is contrary to the specification and indefinite. The court, however, does not find these portions of the Johansson patent to be inconsistent or indefinite.

The purpose of camouflage is to reduce the detectability of an object. R. at 2794. The Johansson patent specifically states that it "relates to an improved camouflage for *minimizing detection of objects* by radar reconnaissance which comprises a multi-layered material to both absorb and *reflect* radar signals...." Col. 1, lines 5–8 (emphasis added). It is intended that camouflage hide an object by making it resemble, both visually

and electrically, the surrounding terrain or foliage. When radar impinges upon an uncamouflaged object such as a tank, the tank will typically reflect much more of the radar than will the surrounding terrain. As a result, the tank will appear as a bright spot on a radar map, thereby identifying its location. Camouflage is placed over the tank to reduce the amount of reflection returning to the radar to reduce the bright spots appearing on a radar map. Likewise, at the opposite end of the spectrum, since the surrounding terrain does reflect some of the incident radar, if the camouflage were to absorb all the incident radar so that none were returned to the source, the object would appear on a radar map as a black hole, again identifying the object's location. Thus, the specification describes the purpose of this invention to both absorb and reflect radar signals. Col. 1, line 8. By both absorbing and reflecting the radar signals, the occurrences of bright spots and black holes should be reduced.

The specification also provides the results of tests conducted with a number of camouflaging sheets or foils in a table in Col. 7 of the Johansson patent. The table contains data for eight camouflage samples in columns labeled "Power Absorption %," "Power reflection from foil %," "Power reflection from target %," and "Power reflection from target dB" among others.[12] Since the table contains data for both the power reflected from the target and power reflected from the foil, each party argues that the test results support their position. However, the specification never states which of these measurements is preferred. The test results themselves, as reported in the table, do not show that reflection from the target was the preferred measurement; four out of the seven reported reflection values from the target were less than 10%, whereas five out of eight values for reflection from the foil were above 10%. *See* R. at 1295–97. In addition, the specification also does not mention whether any of the samples in these tests were considered more promising than any others or that any specific sample was preferred. Simply put, the test results in Col. 7 do not indicate what type of reflection measurement is preferred or which sample was preferred. Rather, considered with other portions of the specification and the claims, the results again highlight Johansson's concern with obtaining some reflection, be it from the target or the screen or both.

Thus, while the specification discusses a 10% reflection from the screen and Claim 1 refers to ensuring partial reflection from the object, these provisions are not inconsistent. Given the purpose of camouflage, it only makes sense that when Johansson discusses reflection he is concerned with having some of the incident radar returned to the source so that the camouflaged object does not appear as a black hole. Reading the specification and the claims together shows that Johansson desired at least 10% of the incident radar be reflected so some radar is returned to the radar source whether it be from the camouflage screen, the object or both. In other words, from the claims and the specification, it is clear that at least 10% of the radar reaching the camouflaged object should be reflected. Thus, the claim is not indefinite, for one of ordinary skill in the art would know that the purpose of the reflection requirement is to have some of the radar returned to the radar source by the camouflaged object.

The court cannot accept plaintiff's occasional argument that the reflection requirement should be interpreted to require 10% reflection from the object not including any reflection from the screen. Plaintiff argues that the portion of the specification at Col. 4 where it specifically and plainly states that the camouflage material should reflect 10% of the incident radar cannot be used to construe the claims because that same portion of the specification contains an obvious technical misunderstanding. Specifically, in Col. 4, at lines 40–43, the Johansson patent states

---

12. It is apparent from the testimony of Drs. Thiele and Jaggard that the data in the columns labeled power reflection from target measured in percent and dB are off by a factor of 100 and 2, respectively. For example, the power reflection data for sample one should properly be 5% and 4 dB rather than 0.05% and 2 dB. However, the court accepts these experts' testimony that these errors would have been obvious to one skilled in the art and that one skilled in the art would have readily known the correct values.

"i.e., [the camouflaging material's] power reflection factor should be at least 10 percent which involves that the surface resistivity of the material must differ markedly from the value of 377 ohms/sq." As described in the specification and discussed earlier, Johansson mistakenly believed that if a camouflaging layer had a surface resistivity of 377 ohms, the resistivity of free space, all radar radiation would be absorbed and none reflected. The court accepts, as all the experts agree, that Johansson was mistaken in this respect; a screen having a resistivity of 377 ohms would indeed reflect 11.11% of the incident radar power. Plaintiff argues that Johansson's misconception about what happens at 377 ohms taints the entire paragraph in which it appears, and, as a result, the court cannot use this discussion about 10% reflection from the screen to interpret the claims. Plaintiff apparently believes that since this portion of the specification contains a technical error anything contained in it should be discarded. This argument, however, is meritless. That Johansson misconstrued what happens around 377 ohms does not discredit his discussion concerning reflection from the screen but rather shows convincingly that his real concern was with ensuring that a certain amount of radar was returned to the source. Because Johansson believed that at "377 ohms per square, all radar radiation would be absorbed and none reflected," Col. 4, lines 37–38, the range of resistivities around 377 ohms was specifically excluded from the claims. This shows that Johansson did not want the situation to arise wherein no radar was returned to the source. If Johansson were only concerned with the reflection from the object not including reflection from the screen, then it would not matter that the screen itself would not reflect any incident radar.

The specification at Col. 4 explicitly discusses obtaining a 10% reflection from the screen; thus, it is clear that Johansson recognizes and anticipates that some radar may be reflected off the screen. As previously stated, this is the only place, other than in the claims, where the 10% reflection requirement is discussed; thus, this is the exact portion of the specification most useful in interpreting that claim limitation. In addition, the specification very clearly states that the camouflage is intended to both absorb and *reflect* radar signals. Col. 1, line 8. Plaintiff has not, therefore, convinced the court that Claim 1 should be interpreted to mean only reflection from the object and cannot include reflection from the screen or that the court should ignore the discussion in the specification concerning reflection from the screen when interpreting the claims.

Plaintiff says that its argument is based on the idea of radar cross-section reduction ("RCSR") that the radar reflection requirement is a comparison between the amount of radar power that is reflected back to the radar sensor from a camouflaged object as compared to an uncamouflaged object. DX 338F (Stimson, *Introduction to Airborne Radar* 606, 171–72). Radar cross-section is a "factor relating the power of the radio waves that a radar target scatters back in the direction of the radar to the power density of the radar's transmitted waves at the target's range." *Id.* at 606. RCSR refers to reducing the cross-section of a target as viewed by radar such as by reducing an object's reflectivity with camouflage. A target's radar cross-section is determined by its geometric cross-section, its reflectivity and the direction it scatters radar. *Id.* at 171. If an object has a higher radar cross-section, it has a greater reflecting power. R. at 2477.

According to plaintiff, RCSR involves taking an object, usually a corner reflector (a retro-reflective radar buoy having hollow cubed corners), transmitting radar at that object and recording the signal which comes back to the radar source. Camouflage is then placed over the object, radar is again transmitted at the object and the signal which comes back to the radar source is recorded. The difference between the amount of radar returned when the object is camouflaged as opposed to uncamouflaged is a measure of the radar cross-section reduction, says plaintiff's expert Dr. Thiele. R. at 1132–33. Plaintiff argues that this is what Johansson describes in Claim 1, *i.e.* that the 10% requirement is referring to the percent of radar return from a camouflaged object when compared to the return of an uncamouflaged object.

This argument, however, relates more to how the reflection limitation can be measured than to what it actually means. In this scenario posited by plaintiff, the reflection from the camouflaged object includes the reflection from the screen. Plaintiff has not suggested any way to separate the reflection due to the screen from the reflection due to the object. Thus, even if RCSR is a method for measuring the resistivity requirement, that does not change the meaning of the limitation that 10% of the radar striking the camouflaged object must be reflected.

In support of its position, plaintiff points to Col. 8 of Johansson which discusses an experiment conducted with a radar reflector buoy. Plaintiff argues that the radar reflector buoy is a corner reflector[13] of the type used when the RCSR of camouflage net is measured. Plaintiff says that because the experiment described in Col. 8 is an RCSR experiment, the power reflection reported in the last sentence of the specification, which states that "[t]he measured average power absorption was between 6.8 and 7.5 dB corresponding to a power reflection of 21.3 and 17.8, respectively" is a difference in the amount of power that is reflected back to the radar when the object is camouflaged to the uncamouflaged object. Contrary to this assertion, the specification does not say what the power reflection measurement is. At no place in the discussion[14] is there any statement or indication of what reflections were taken from the object. Moreover, the specification does not specifically state radar cross-section return. Nor does it, or more importantly do the claims, ever state that the 10% return should be a comparison or a

reduction in the amount of radar returned from an uncamouflaged and a camouflaged object. However, both parties' experts have testified that corner reflectors are used in RCSR type measurements.

While the Johansson patent does not mention RCSR or how the reflection measurements described in Col. 8 were taken, both plaintiff's expert as well as defendant's expert testified that radar reflectors are used for RCSR type measurements. Defendant's expert has commonly performed tests using corner reflectors. Dr. Moore admitted corner reflectors are commonly used to calibrate a radar system. When it comes to testing the screens, the court recognizes that not all the radar directed at a target will actually contact the target due to the spread of the radar as it gets farther from the source. Even a radar having a narrowly focused beam will experience some spread of its beam by the time it reaches the target. Thus, since the claim is concerned with "incident" radar power, that is the radar striking the object, there must be some way to determine how much radar is striking the object. In other words, the system must be calibrated. Both Drs. Thiele and Moore have testified that corner reflectors, used to measure how much radar reaches a target, consist of three flat conducting plates set at right angles to one another so as to form a three-planed corner. *See, e.g.,* PX 443Q. This design is advantageous because it reflects virtually all of the radio frequency energy it intercepts back in the direction from which it originated. *See* DX 338F (Stimson at 384). An incoming ray ricochets off the three sides

---

13. Dr. Moore agreed that the radar reflector buoy described in Col. 8 is also known as a corner reflector.

14. The last paragraph in the specification, in Col. 8, reads as follows:

The experiments and tests heretofore mentioned with respect to a three-layer sheet (of the type shown in FIG. 2 consisting of two outer PVC optical camouflaging layers and an intermediate radar camouflage layer of the type described and illustrated in FIG. 2a, the intermediate layer being a non-woven polyester fabric having steel fibrils of approximately 9 microns in diameter embedded therein, and the sheet being cut and extended to form a leaf-like three-dimensional netting approximately as shown in

FIG. 5), were made with a radar reflector buoy, consisting of hollow cube corners, having an equivalent reflecting area of 300 square meters. The buoy was mounted at 1 meter distance above the ground on a flat meadow and was covered entirely with the camouflaging sheet. The data of the side looking radar set were: frequency—9200 MHz; power—22 KW; pulse length—0.3 microseconds; aerial gain—(−37 dB); polarization—linear, vertical, aerial lobe angle 2.4° both vertically and horizontally (circular cross-section); distance from radar source to target—3850 meters. The measured average power absorption was between 6.8 and 7.5 dB corresponding to a power reflection of 21.3 and 17.8 percent, respectively.

of the corner and returns to its source, which can be fitted with means to quantify the power reflection from the target, either with or without the camouflage netting. R. at 1085 (Thiele). Ideally, the purpose of the corner reflector is to avoid losing any of the incoming rays and get absolute reflection. R. at 1085–86 (Thiele). By measuring the return from a corner reflector the system can be calibrated and the amount of radar reaching the object determined.

The court agrees that the tests described at Col. 8 involved measuring the return from a corner reflector to calibrate the system and then measuring the return from a camouflaged object. Dr. Thiele testified that the corner reflector referred to in Col. 8 was used because it reflected rays right back to the source. R. at 1085. Dr. Moore agreed that the radar system would have to be calibrated and agreed that a corner reflector is a standard calibration target for radar. R. at 3023. Thus, the tests described in Col. 8 explain one way of determining if a camouflaged object reflects 10%. That reflection, however, still includes reflection from the screen and the object. Plaintiff has failed to convince the court, even given its argument regarding RCSR, that the reflection claimed in Claim 1 excludes reflection from the screen. Plaintiff says that radar is directed at an uncamouflaged object and the return is measured and that this is compared to the return from a camouflaged object. Even in this scenario posited by plaintiff, when radar hits the camouflaged object, the radar which is returned to the source includes reflection from the screen as well as reflection from the object. Plaintiff has failed to explain how the reflection from the object can be separated from the reflection from the screen. Theoretically, the reflection from the screen could be measured by placing behind the screen a material that was totally absorbing. Thus, whatever reflection returned to the source would necessarily have had to come from the screen. Plaintiff's argument really only relates to testing the reflection requirement and not to what it means. Given the expert testimony in this case, the court agrees that the test described in Col. 8, involved a corner reflector and may be an RCSR measurement. However, this finding only relates to one method for determining or testing whether the 10% reflection requirement is met and not to what components make up the total reflection.

In sum, while the court agrees that, in practice, one testing method involves calibrating the radar system against a highly reflective corner reflector and then measuring of the return from a camouflaged object, plaintiff has failed to convince the court that the 10% reflection must come from the object itself and cannot include reflection from the screen. The specification at Col. 4 plainly states that reflection should be from the screen. The experiments reported later in the specification do not contradict this statement. This interpretation is consistent with the purpose of camouflage—to conceal an object by matching the surrounding terrain. Johansson specifically desired that some portion of radar transmitted at a camouflaged object be returned to the radar source. Claim 1 refers to ensuring a reflection of 10% of the "incident" radar. Thus, 10% of the radar falling upon the camouflaged object must be returned. If the screen itself reflects 10% of the radar, then it has "ensured" a 10% return.

Defendant's expert, Dr. Moore agrees that the purpose of camouflage is to reduce the detectability of the target and that, therefore, the reflection from the target and the reflection from the camouflage material over the target must be considered when interpreting the 10% reflection limitation. R. at 2794. However, defendant argues that because the amount of reflection from an object depends on the object's shape and size and how the net is deployed, a camouflage can not ensure a 10% reflection from every object. As a result, defendant asserts the claim is indefinite, or alternatively, if the claim is found definite, it should be interpreted as reading the camouflage screen should reflect 10% of the incident radar power.

Defendant properly notes that the amount of power transmitted, reflected and absorbed by an object varies from object to object. Because radar return from a target is a function of the size, shape, composition and orientation of an object, a camouflage screen

cannot ensure that a specified amount of power is reflected from every object subject to concealment at radar frequencies. Defendant points out that if the object to be concealed is the focus of the limitation regarding power reflection, a given camouflage material could satisfy this limitation for some objects but not others. According to defendant, Claim 1 refers to the "object" but fails to identify what the "object" is. Citing *Ex parte Brummer*, 12 USPQ2d 1653, 1655 (BdPatApp & Inter1989), defendant argues that Claim 1 is indefinite because a claim with a limitation based on an external thing not having standard characteristics is indefinite under § 112. As further evidence of indefiniteness, defendant points out that the camouflage material may include numerous cuts or incisions which may affect the amount of radar transmitted to the object and thus, reflected from the object. Defendant argues one of ordinary skill in the art would not know how to test material with cuts or incisions to determine if this requirement is met.

Finally, because the amount of reflection from the target depends on how the net is deployed, *i.e.*, the angle of the net and how it is draped can affect the amount of radar reaching an object, and thereby reflecting from an object, defendant argues that one cannot ensure a 10% reflection from the target or from the target plus the screen. R. at 2795. As a result, Dr. Moore argues that the 10% reflection must be from the resistive sheet used in the camouflage—that is the only way to ensure a 10% reflection. R. at 2795. This argument is incorrect for two reasons. First, deploying the net over a corner reflector produces variations in results based on how the net is draped. Secondly, and more importantly, Claim 1 does not say a 10% return from the screen only. Rather, it refers a 10% return from the object, *i.e.*, ensures that 10% of the incident radar is returned to the radar source. The language used in a claim defines the scope of the invention, and therefore, a court may not ignore the specific language chosen by the inventor and placed in the claims. While it is

true that if the screen reflects 10%, then one has ensured a reflection of 10%, this does not mean the reflection necessarily excludes reflection from the object.

For purposes of determining whether a given camouflage satisfies the claims, the target object may be a corner reflector, and while the screen may not reflect 10%, its reflection combined with that of the corner reflector may exceed 10%. Simply put, defendant has failed to convince the court that the reflection requirement should not include the reflection from the object.

Plaintiff contends that knowing the resistivity of the screens is enough to quantify the amount of reflected power. According to plaintiff's expert, Dr. Thiele, this is really a measure of "the energy which passes through the camouflage material to the object and then back through the camouflage material again." R. at 1131–32. Plaintiff has stated that this value does not include any reflection from the screen, but it has not shown how the reflection from the screen is excluded from this value. *See* R. at 2411, 2417. Dr. Thiele says to interpret reflection requirement to mean that 10% of the incident energy—"the energy which passes through the camouflage material to the object and then back through the camouflage material again"—reflected from the object. R. at 1131–32. Dr. Thiele points to page 18 of PX 2 which describes measurements in the table as being power reflection from targets and says the value given in the table is that fraction of incident energy which comes directly from the target and through the foil. R. at 1131–32.[15] Dr. Thiele also believes the power reflection columns are off by a factor of 100 and decibels columns are off by a factor of two. R. at 1294–95. Ultimately, "[t]he court has broad power to look as a matter of law to the prosecution history of the patent in order to ascertain the true meaning of language used in the patent claims," *Markman*, 52 F.3d at 980, and after having exercised this power, this court remains unconvinced that the reflection re-

---

**15.** *Lossy dielectric,* which may be used interchangeably with dielectric (changes phase of electromagnetic wave passing through) when talking about radar absorbing materials, is one

that not only changes the phase, but actually absorbs some of the energy—*i.e.*, attenuates the wave in some way. R. at 2169 (Moore).

quirement does not include the reflection from the target as well as the reflection from the screen.

## II. *Infringement.*

Plaintiff claims that certain camouflage screens provided to the government by Teledyne and Sioux infringe certain claims of the Johansson patent. The accused products can be broken down as follows: (1) screens manufactured by Teledyne under the A117 contract; (2) screens manufactured by Teledyne under the B007 contract; (3) screens produced by Sioux under the C288 contract; (4) screens produced by Teledyne under the A060 contract; (5) screens produced by Sioux under the A063 contract; and (6) screens produced by Teledyne under the C0180 contract. Specifically, plaintiff asserts that all the camouflage screens infringe Claims 1, 13, and 14 of Johansson; that all Teledyne screens and repair kits and Sioux camouflage screens made with Teledyne's color-coated carbon cloth under the A060, C288, A063, and C0180 contracts also infringe Claims 9, 10, and 11; and that all Teledyne camouflage screens and repair kits made with color-coated cloth containing stainless steel fibers under the A117, B007, and A060 contracts also infringe Claims 4, 5, 6, and 8.

The polyester/steel screens produced under the B007 contract were the same as the screens manufacture under the A117 contract. The polyester/steel screen was reformulated for the A060 contract, and the carbon cloth screens procured under the A060 contract are representative of the screens procured under the C0128, C288 and A063 contracts. Accordingly, the camouflage screens at issue can be broken down into three categories for the purposes of infringement analysis: (1) the polyester/steel screens procured under the A117 and B007 contracts; (2) the polyester/steel screens under the A060 contract; and (3) the carbon cloth

screens under the A060, C288, A063, and A0180 contracts.

The evidence presented at trial establishes that all of the camouflage screens produced by Teledyne and Sioux comprised a multi-layered sheet of flexible material having an electrically resistive layer and a substantially insulating layer as required by Claim 1. The resistive layer is inhomogeneous and electrically thin, as also required by Claim 1. In addition, all reported resistivity values would reflect at least 10% of the incident radar power.[16] *Therefore,* the critical element of Claim 1 at issue in this infringement action is the resistivity requirement—whether the electrically conductive film has, "at radio frequencies exceeding 2,000 MHz, a surface resistivity falling between a lower limit of 100 ohms and an upper limit of 1,000 ohms but considerably different from 377 ohms...."

## A. Literal Infringement
### *Polyester/steel screens—A117 and B007 Contracts*

Claim 1 of Johansson specifies a surface resistivity of between 100 ohms and 1,000 ohms but considerably different from 377 ohms. The results of Army testing at the time it received camouflage screens under the A117 contract show that the screens did not meet government specification and only had a surface resistivity of between 50 to 60 ohms. The government specification required a one way transmission of 10% to 20%, or $-10$ dB to $-7$ dB which corresponds to a surface resistivity between 87 ohms and 152. The government measured the Teledyne screens to be $-13$ dB which corresponds to a surface resistivity of 50 to 60 ohms. In other words, the government found that the Teledyne screens were too low in resistivity. The Army's results were confirmed by a laboratory at Georgia Tech.

While Teledyne reported that its screens met military specifications, the government determined that Teledyne's testing proce-

16. The relationship between % power reflection (R) and transmission (T) can be considered by examining the following mathematical formulae, to which the parties have agreed:

$$R = |n_0/n_0 + 2Z|^2 \times 100\% \qquad T = |2Z/n_0 + 2Z|^2 \times 100\%$$

where impedance (Z) is expressed in ohms per square and $n_0 = 377$ ohms (the characteristic impedance of free space).

dures resulted in incorrect measurements. Specifically, the Army determined that Teledyne's use of plexiglass inflated the resistivity measurements of Teledyne. At the time this contract was being carried, prior to this litigation, the evidence shows that Brunswick also believed that Teledyne's screen did not meet specification and that Teledyne's testing procedures resulted in inaccurate and inflated surface resistivities measurements. Brunswick conducted its own tests using Teledyne's testing procedures. It found those procedures flawed, resulting in increased transmission measurements of 8% to 9%.

Now, some five to seven years later, when plaintiff is in litigation over those very same screens, plaintiff tries to rely on Teledyne's test results to show that the screens under the A117 and B007 contracts infringe Johansson. Brunswick now conveniently argues that there was nothing wrong with Teledyne's testing procedures and that Teledyne's use of plexiglass in its testing of the cloths produced for the A117 and B007 contracts did not affect the test results. The court finds Brunswick's change of heart in light of this litigation disingenuous.

Brunswick argues that, because the plexiglass was the thickness of one-half wavelength, it should have had no effect on the results. However, Brunswick's own tests as well as the Army's and Georgia Tech's showed that the plexiglass resulted in incorrect surface resistivity measurements. Brunswick noted an increase in transmission measurements of 8% to 9%. Brunswick now argues such an increase should not have occurred. Interestingly, plaintiff also tries to discredit test results of defendant's expert Dr. Moore, because Dr. Moore only performed tests on the finished camouflage screen having the PVC layers. Plaintiff argues testing the screen with a two mil layer of PVC rather than without the PVC increases transmission results by 8% to 9%. Plaintiff attempts to reconcile these two opposite positions by arguing that thickness of the plastic used in each case is different having different affects on the results. Plaintiff ar-

gues that the plexiglass Teledyne used was approximately 0.2 inches thick which is precisely one-half a wavelength thick at the frequency used—16.03 GHz. According to plaintiff if the plexiglass is one-half wavelength thick, it has no effect on the transmission value. On the other hand, plaintiff apparently argues that the PVC coating was 2 mils thick, which is not a one-half wavelength and contained some additional particles so it did affect the results. The court finds plaintiff's conflicting positions to be too convenient and self-serving to be credited, especially given plaintiff's earlier finding that use of plexiglass did cause inaccurate results.

Since the evidence shows that the testing procedures employed by Teledyne for the cloth produced under the A117 and B007 produced inaccurate results, the court does not ascribe much weight to the test results obtained by Teledyne. Instead, the court finds persuasive on the issue of the resistivity of the screens under the A117 and B007 contracts, the government's testing of those screens at the time it received them and not for purposes of litigation. Those tests show that the resistivity of the screens under the A117 and B007 contracts was 50–60 ohms (−13 dB one way transmission). This value is outside the range of Claim 1; thus, the screens under the A117 and B007 contract do not literally infringe Claim 1.

Plaintiff also relies on radar transmission data in first article test reports prepared by Teledyne from September 1985 (PX 134) and March 1987 (PX 135). However, those tests were also performed using the inaccurate method of inserting a plexi-glass sheet.[17]

The parties also performed tests on samples of the camouflage provided under the A117 and B007 contracts. Plaintiff's expert, Dr. Thiele, performed tests on a sample (PX 188) of camouflage from the B007 contract provided by the government before the PVC was removed from the color-coated cloth, the same cloth used in fulfilling the A117 and B007 contracts. The results are shown in PX 189. The test was performed at four polarizations: 0, 90, 180 and 270 degrees.

---

17. Millimeter Technology did not verify Teledyne's test results under the A117 and B070 contracts, just the A060 contract.

Four sets of test results are provided. The PVC layer was removed in order to test the electrically resistive layer, and the results are shown in PX 191. Dr. Jaggard summarizes these test results on p. 44 of his report. Dr. Jaggard's summary shows that the resistivity varies from 88.8 ohms +/− 26.3 ohms to 122.4 ohms +/− 19.1 ohms depending on the model used.

Tests were also performed by plaintiff on a sample of cloth under the A117 contract (PX 200). The results are shown in PX 201. In that case, tests were performed at 0 and 90 degrees using first a series model and then a shunt model. Dr. Jaggard summarized the results of this test at p. 44 in his report in the third column. Dr. Jaggard calculated the average resistivity for 4–18 GHz to be 91.4 ohms +/− 7 ohms using a series model and 99.3 ohms +/− 16.4 ohms using a shunt or parallel model.

The results of the both of these series of tests show surface resistivities greater than those found by the Army. However, results from other tests of surface resistivities (around 60 ohms) reported by plaintiff are more in line with the Army's results. Other tests performed by Robert Powell yielded one-way transmission data for a partial roll of Teledyne greige cloth, bearing the same weight percentage of steel (PX 158), provided to Brunswick by Teledyne having a steel content of 2.8%. One-way radar transmission attenuation and phase shift was measured at fifteen different locations along the partial roll in two orthogonal orientations. The test results are shown in PX 159. Plaintiff reported that these tests showed an average surface resistivity of 60.67 ohms at 6 GHz; 60.90 ohms at 10 GHz; and 63.48 at 17 GHz using series model data. Using parallel/shunt model data, plaintiff reports results of average surface resistivities of 63.17 ohms at 6 GHz, 70.73 ohms at 10 GHz, and 100.11 ohms at 17 GHz. The only reported values for this test that satisfy the resistivity requirement for Claim 1 are at 17 GHz using parallel or series data. All of the other the values are much below the 100 ohm limit in Claim 1 and are more in accordance with the Army's results.

The results of tests performed by Dr. Moore also indicate that the resistivity of the screens produced under the A117 and B007 contracts are much below 100 ohms. Dr. Moore performed tests on material from all of the contracts. Dr. Moore tested each sample at two polarizations and at 401 frequencies for each polarization. The data obtained by Dr. Moore does not depend upon any particular circuit model. The results are shown in DX 119, although the raw data for Dr. Moore's tests are not provided. Dr. Moore shows *average* impedance results for six samples of nets and reports an average surface resistance for: the hexagonal samples under the A117 contract of 54.55 ohms +/− 10.7 ohms; the rhombic nets under the A117 contract of 62.13 ohms +/− 9.76 ohms; and the rhombic nets under the B007 contract resistance of 57.45 ohms +/− 5.58 ohms. Dr. Moore's test results are also very similar to the Army's test results. Plaintiff challenges Dr. Moore's results because he did not remove the PVC layer. While plaintiff argues that Dr. Thiele's test results indicate that the surface resistivity of a coated screen versus an uncoated screen is on average 8.7% higher, Defendant argues that the 2 mil PVC layer had no affect on the measurements. Even if the court were to assume that Dr. Moore's resistivity values are 8.7% too low, as plaintiff contends, they still are much below 100 ohms once corrected accordingly.

Considering all of the test results together, the court finds the resistivity of the screens under the A117 and B007 contracts to be around 60 ohms. The test results by the Army, taken at the time the screens were received and not for purposes of litigation, show that the screens were between 50 ohms and 60 ohms. Overall, the results of tests performed for purposes of this litigation confirm this data. The Johansson patent claims a surface resistivity between 100 ohms and 1,000 ohms but considerably different from 377 ohms. Consequently, this court cannot find that the screens procured under the A117 and B007 contracts infringe the Johansson patent.

## B. The Doctrine of Equivalents

██ Plaintiff argues that if the screens under the A117 and B007 contracts are not literally covered by Claim 1 then they infringe the '606 patent under the *doctrine of equivalents*. Plaintiff contends that even if the lower limit of the radar camouflaging layer is found to be 50 ohms, such a layer achieves substantially the same result as one between 100 and 1,000 ohms but considerably different from 377 ohms. According to plaintiff, reducing the surface resistivity to 50 ohms only changes the range of surface resistivities disclosed in the Johansson patent by 5½%. "[Claims] must be construed in the identical way for both infringement and validity." *Kimberly–Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1449 (Fed.Cir.1984). Plaintiff's position in favor of equivalence is contrary to plaintiff's position with regard to the DARE Technology ("DARE") screens being different because their surface resistivity was low (around 50 ohms). Dr. Jaggard proposed a range of +/− 20 ohms based on the accuracy of the testing. Thus 80 ohms might qualify, but 50 and 60 ohms do not.

Plaintiff contends that the government accepted the screens as equivalent. This is incorrect for many reasons and does not show equivalency for purposes of the doctrine of equivalents. First, the Army did not accept the screens as equivalents of the camouflage material claimed in Johansson. The Army was concerned with its specifications and not the claimed device. Second, the Army accepted the screens even though they were out of specification. As part of the contract modification to the A060, the Army accepted the 60,000 screens systems under the A117 and B007 contracts even though they were non-conforming. In its determination to modify the A060 contract, the Army specifically noted the poor performance of the screens under the A117 and B007 contracts. Thus, by accepting the screens, the Army was not admitting that the screens performed the same function to produce the same results in substantially the same way as screens produced according to the specifications, let alone any screens produced according to the Johansson patent. Thus, the court finds that the polyester/steel screens covered by the A117 and B007 contracts do not infringe the Johansson patent under the doctrine of equivalents.

### Polyester/steel screens—A060 Contract

██ Around September 1987, the Army and Teledyne performed the tests on Teledyne's 2.2% stainless steel reformulated cloth to be provided under the A060 contract. The Army tested the cloth in both the fill and the warp directions and provided the results to Teledyne. *See* PX 147. According to the Army's results the transmission in the fill direction of the polyester/steel cloth varied between −7 dB to −10 dB at 4.0 GHz to 18 GHz. These results contained an occasional reading of −6.1 dB or a transmission greater than −10 dB. However, these variations were only a few values out of 150 measurements and are thus insignificant. When tested in the warp direction, the results were more varied, but on average the values were again mostly between −7 and −10 dB. Moreover, the measured values outside of this range around 4–5 GHz were less than −7 dB which corresponds to a resistivity greater than 150 ohms. It is true that around 17 GHz the Army found values up to −1 dB greater than −10 dB. PX 147. Thus, the Army's test data, prepared at the time the screens were manufactured and not prepared in connection with this litigation, considered in their entirety, show that in both the warp and fill direction the 2.2% polyester/steel cloth had a one way transmission between −7 dB and −10 dB which correspond to a surface resistivity range of 152 ohms to 87 ohms. At 17 ohms the Army did calculate a variance in the one way transmission of up to −11 dB (which corresponds to 74 ohms) in the warp direction. However when the test was performed in the fill direction this variance was not measured. All measured values at 17 GHz were between −9.141 dB and −9.614 db, which corresponds to a surface resistivity between 93 ohms and 101 ohms. *See* PX 147. Thus, when the tests in the warp and fill direction are considered together, they show that the one way transmission was between −7 to −10 dB for 4–17 GHz. Moreover, after careful examination and consideration of both of these sets of results, the court finds that

the transmission is in most of the data points or a significant number of the data points was at or above $-9.2$ dB, which corresponds to a surface resistivity at or above 100 ohms. Thus, the resistivity requirement of Claim 1 is literally met. This data, which was generated by the Army and not generated in connection with this litigation, is more persuasive than test results generated in connection with this litigation. Since this was the cloth Teledyne used in performing the A060 contract, the court finds that the 10,500 polyester/steel screens under the A060 contract literally fall with the resistivity requirement of Claim 1. Given the small variation below 100 ohms and Dr. Jaggard's statement that tests cannot be more reliable than $+/-$ 20 ohms, Teledyne's test results confirm that the screens are within the specifications and the literal words of the claims. These tests were confirmed by Millimeter Wave Technology. Thus, the court finds that the screens in dispute come with Claim 1 in terms of resistivity.

■ Robert Powell, as witnessed by plaintiff's expert, Dr. Thiele, made one-way transmission measurements on samples of the stainless/steel cloth provided under the A060 cloth. Plaintiff reports a surface resistivity of 73 ohms at all frequencies in the range of 4 to 18 GHz using a transmission line model (results in PX 205) and a surface resistivity for another sample of 89 ohms at all frequencies in the range from 4 to 18 GHz. Plaintiff says these values would be greater if calculated using a transmission line model in which a shunt or parallel circuit is assumed. The court's review of plaintiff's test data results [18] performed on sample PX 204 and PX 206 reveals that they had surface resistivities of 73 ohms and 89 ohms, respectively, at frequencies between 4 to 18 GHz. Defendant has failed to rebut the view of Dr. Thiele based on this evidence that camouflage fabric demonstrating these surface resistivity characteristics performs the same function in the same way to achieve the same result as the invention claimed by the Johansson patent. Consequently, the screens procured under the A060 contract infringe

18. *See* PX 205 and PX 207.

the Johansson patent under the doctrine of equivalents.

### Carbon cloth screens—A060, C288, A063, and C0180 Contracts

■ There are no Army test results on these screens. The Army appears to have accepted these carbon cloth screens as being within specification, *i.e.*, 87 ohms to 152 ohms. All available test data, even Dr. Moore's, show that the carbon cloth screens have a resistivity of around 100 ohms. Thus, the carbon cloth screens covered under the A060, C288, A063, and C0180 contracts infringe the Johansson patent either literally or under the doctrine of equivalents.

Dr. Moore reported for the A060 hex nets resistance of 75.06 ohms $+/-$ 5.58; for the A060 rhombic nets of 74.96 ohms $+/-$ 5.88; and another hex net for the A060 109 ohms $+/-$ 11.08 ohms. Dr. Moore also provided values which are averages of the rhombic and hex nets. However, these average values had already been averaged, rendering the data suspect. Further, Dr. Moore performed these tests without removing the PVC. He testified that the PVC had a negligible effect since it was only 2 mils (or 0.002 inches) thick, but plaintiff says it lowers the values by 8.7% so the PVC could warp the values. A Brunswick technical memorandum prepared by C.R. Rush and R.H. Powell, dated June 13, 1983 (DX 135), shows that the one way transmission values of a coated and uncoated cloth does not vary. Moreover, test results provided to the government by Brunswick when it was challenging Teledyne's method of measuring surface resistivity, show that the one-way transmission through a flat stock did not change with the addition of 0.002 inches of Mylar PVC. DX 114. In short, regardless of whether the PVC actually distorted the values, the variance, if any, in test results was not significant. The fact remains and the court finds that the carbon cloth screens under the A060, C288, A063, and C0180 contracts infringe the Johansson patent for the foregoing reasons.

## III. *Validity.*

■ As a defense to plaintiff's charge of infringement, defendant asserts that the Johansson patent is invalid and relies on a number of bases. The government's defenses are characterized by two types of invalidity arguments, anticipation and obviousness. The burden of persuasion to prove invalidity remains always on the party asserting the defense. *ACS Hosp.*, 732 F.2d at 1575.

Defendant asserts that Claim 1 of Johansson is *invalid* due to prior inventors' activities based on the DARE screens or U.S. Patent No. 3,349,397 ("Rosenthal '397" or "Rosenthal") and that Claims 4–6 and 8–11 are invalid based on the DARE screens or Rosenthal in various combinations with U.S. Patent No. 3,300,781 (Clough '781"), U.S. Patent No. 3,315,259 ("Wesch '259"), U.S. Patent No. 3,290,680 ("Wesch '680"), British Patent Specification No. 1,074,851 assigned to Eltro Gesellschaft and Eltro G.m.b.H ("Eltro '851"), U.S. Patent No. 3,208,013 ("Walker '013"), and U.S. Patent No. 3,599,210 ("Stander '210"). Defendant asserts that Claims 13–14 are invalid based on the DARE screens or Rosenthal '397 in view of U.S. Patent No. 3,069,796 ("Ruter '796").

Defendant argues that the Johansson patent would have been *obvious* to a person having ordinary skill in the art based on camouflaged screens manufactured by DARE Technology alone and in combination with other references. Defendant also asserts the Johansson patent is obvious under 35 U.S.C. § 103 based on Rosenthal '397 alone and in combination with other references to the prior art. Specifically, defendant charges that: Claim 1 was obvious in view of Rosenthal '397 or the DARE screens; Claim 4 which depends from Claim 1 was obvious based on Rosenthal in view of Clough '781 or the DARE screens in view of Clough '781; Claim 5 which depends from Claim 4 was obvious based on Rosenthal in view of Clough '781, the DARE screens in view of Clough '781, or the DARE screens in view of Wesch '259; Claim 6 which depends from Claim 1 was obvious based on Rosenthal '397 in view of Wesch '680, or the DARE screens in view of Wesch '680; Claim 8 which depends from Claim 6 was obvious based on Rosenthal '397 in view of Eltro '851 or the DARE screens in view of Eltro '851; Claim 9 which depends from Claim 1 was obvious based on Rosenthal '397 or the DARE screens; Claims 4–6 and 8–11 were obvious based on the DARE screens in view of Clough '781, Wesch '259, Wesch '680, Eltro '851, Rosenthal '397, Walker '013, or Stander '210; these latter claims were obvious based on Rosenthal '397 in view of references to the prior art; Claim 13 was obvious based on the DARE screens or Rosenthal '397 in view of Ruter '796; and that Claim 14 was obvious based on the DARE screens or Rosenthal '397 in view of Ruter '796.

### A. Priority—First to Invent

Defendant argues that the Johansson patent is invalid because it was obvious under 35 U.S.C. § 103 in view of the screens made by the DARE corporation. Defendant's argument is really based on § 102(g), that the DARE screens are the same invention as, or at least anticipated, the device described in the Johansson patent and that Maynard H. Dawson of the Whittaker Corporation and DARE conceived of the DARE screens prior to Johansson. Section 102(g) relates to prior inventorship by another in this country. *Kimberly–Clark*, 745 F.2d at 1444. The U.S. patent system is based on the idea that the first to invent is entitled to a patent, not later inventors except in certain circumstances. Under § 102(g) a person shall be entitled to a patent unless "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g) (1952). Thus, if Dawson made the invention described in the Johansson patent in this country before Johansson and did not abandon, suppress or conceal it, then Johansson would not be entitled to a patent under § 102(g). Therefore, the court must determine the priority of invention of the DARE screens vis a vis the Johansson patent.

The rules relating to priority of invention are found in § 102(g). *See also Kimberly–Clark*, 745 F.2d at 1444. According to § 102(g) "[i]n determining priority of invention there shall be considered not only the respective dates of conception and reduction

to practice, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other." 35 U.S.C. § 102(g). Thus, the court is concerned with the respective dates of conception and reduction to practice of the Johansson patent and the DARE screens.

■ Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech*, 802 F.2d at 1376 (quoting 1 *Robinson On Patents* 532 (1890), *cited in Markman v. Westview Instr., Inc.*, 52 F.3d 967 (Fed.Cir.1995)); *Coleman v. Dines*, 754 F.2d 353, 359 (Fed.Cir.1985). It is not enough that the inventor merely conceive of his final invention, for he must also possess "an operative method of making it.... In some instances, an inventor is unable to establish a conception until he has reduced the invention to practice through a successful experiment. This situation results in a simultaneous conception and reduction to practice." *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d at 1206. "Actual reduction to practice requires that the claimed invention work for its intended purpose," *Hybritech*, 802 F.2d at 1376, whereas *constructive* reduction to practice occurs upon the filing of a patent application on the claimed invention. *Id.* Moreover, proof of conception requires showing that every limitation of the claim was known to the inventor at the time of conception. *Coleman v. Dines*, 754 F.2d at 359. Corroborating evidence of the type showing that the inventor communicated his completed idea for an invention to others in such a manner as to enable those skilled in the art to make the invention is required to show conception. *Id.*

### 1. Priority date of Johansson '606

■ The Johansson patent is entitled to a priority date of April 6, 1971, its filing date, as a constructive reduction to practice. *See* PX 2. Although Johansson is a continuation-in-part of an earlier filed application and claims priority based on foreign applications, it is not entitled to an earlier priority date based on these applications, for these related applications neither disclose nor specifically refer to the invention claimed by the Johansson patent. 35 U.S.C. § 120 (1952).

■ Plaintiff asserts a priority date earlier than its constructive reduction to practice date for Claims 1, 10, 11, 13 and 14 of the Johansson patent based on conception. Since Johansson was a foreign inventor, however, plaintiff is limited in its ability to prove an earlier date of conception. By operation of 35 U.S.C. § 104 (1975), plaintiff is precluded from referring to acts abroad to establish a date of conception. Section 104 provides that "a patentee, may not establish a date of invention by reference to knowledge or use thereof, or other activity with respect thereto, in a foreign country...."[19] Thus, plaintiff may only offer up acts or events occurring in this country to show conception. Given this limitation, plaintiff contends it can show conception of the invention defined by these claims as early as October 23, 1970.

■ Plaintiff contends that a sample of the invention was brought into the United States on October 23, 1970, along with a report describing the invention in detail and how it performed in radar measurements and that the sample and report were disclosed to members of the United States Army. This, according to plaintiff, establishes conception of certain claims of the Johansson patent.

To establish conception, plaintiff relies on an October 23, 1970, meeting during which Bengt Soderstrom, President of Barracuda, met with John Hopkins of the U.S. Army at Fort Belvoir to discuss a new radar scattering camouflage net that Barracuda was developing. Several officers and civil servants were present at the meeting. According to his testimony, Mr. Soderstrom brought a

19. Section 104 of the Patent Act contains two exceptions, neither of which is applicable in this case. The court further notes that as a result of TRIPPS and GATT, § 104 was amended to allow GATT country members to use acts abroad to prove a date of invention. Section 104 as amended, however, only applies to applications filed on or after January 1, 1996. Since the Johansson patent was filed before that date, plaintiffs cannot avail themselves of this relaxed rule concerning priority of invention.

sample of the new camouflage net and a detailed report, PX 25, describing Barracuda's development of its lightweight camouflage screen. R. at 1359. The report, dated October 23, 1970, explains Barracuda's initial research into various aspects of camouflage nets—specifically, screen size, geometry, synthetic garnishing materials, affixing garnishing to the net, radar scattering, and integral support structure. The report discusses Barracuda's initial failures and what it ultimately found successful. The camouflage net described in the report consists of a layer of stainless steel fibers in a non-woven material which reflected 10% of the transmitted power. *Soderstrom Report* at 14, 15. The camouflage sample, which contained incisions and was described in the report, brought by Mr. Soderstrom, was passed around the room for the attendees to examine and feel. R. at 1367. According to Mr. Soderstrom, the sample had three layers—one radar scattering layer and two green colored plastic coatings on each side. R. at 1367. The radar scattering layer was described in the report and consisted of a spun-bonded cloth of a specific tensile strength on top of which were stainless steel fibers dispersed randomly over the entire surface. The attendees of the meeting were apprised of all of this information. R. at 1369.

Mr. Soderstrom testified that he signed the last page of the report at the meeting in the presence of the attendees, handed it to Mr. Hopkins, and then proceeded to discuss the reported results. R. at 1360. The report contained test data and the results of Barracuda's efforts to develop a lightweight camouflage. The report detailed the radar properties of the sample Mr. Soderstrom brought with him and described experiments conducted, including tests performed with and without camouflage using a rigid aluminum sheet as a target. The reported test results show that the average power return was 10%. R. at 1369. Mr. Soderstrom, however, admitted that no tests were carried out at Fort Belvoir and that he retained the sample at the end of the meeting. R. at 1378.

Plaintiff also points to an October 30, 1970, meeting of an informal group called Camouflage Program of American Industries ("CPAI") to establish a date of conception. Mr. Soderstrom attended this meeting which included seven other people from the industry. During the meeting Mr. Soderstrom discussed different principles of radar scattering and the different materials which could be used such as carbon powder, carbon fibers, metalized fibers, and woven materials which consist of metal fibers or fibrils. R. at 1366. Mr. Soderstrom also brought to the meeting a sample of the camouflage material consisting of steel fibers or fibrils with spun-bonded nylon to the meeting. R. at 1366–67.

The plaintiff's expert, Dr. Thiele, testified that the material shown to the Army at the October 23, 1970, meeting met all the limitations of Claims 1, 10, 11, 13 and 14. According to Dr. Thiele, the sample shown to the army was 5 mils thick, had a single resistive layer of randomly oriented stainless steel fibers supported on unwoven material, and included two substantially insulating layers. Further, Dr. Thiele testified that the transmission attenuation described in the report is indicative of a surface resistivity in excess of 100 ohms but less that 330 ohms. Dr. Thiele also noted that the report states that 10% of the power was returned. Based on all this, plaintiff argues that conception of Claims 1, 10, 11, 13, and 14 is shown as of October 23, 1970. Defendant does not refute plaintiff's position, the testimony of Mr. Soderstrom, or the testimony of Dr. Thiele regarding conception except to argue that delivery and receipt of a sample of the camouflage in the United States is insufficient to show an actual reduction to practice.

"In the case of conception and reduction to practice, it is well settled that the conception must take place in the United States, or in lieu thereof, it must have been brought to this country or *must have been communicated to some one [sic] in this country*." *Colbert v. Lofdahl*, 21 USPQ2d 1068, 1071 (Bd Pat App & Inter 1991) (emphasis added). However, it is not enough to bring the invention into the country, "the inventor must make an adequate disclosure of the invention to someone in this country." *Id.* In this case it is clear that there was adequate disclosure to Army officials. The court is satis-

fied that the report and the undisputed testimony of Mr. Soderstrom show the formation in the mind of Johansson of a definite and permanent idea of a complete and operative invention. The report dated October 23, 1970, is quite detailed and explains Barracuda's development of a lightweight camouflage screen. *See Soderstrom Report* at 14, 15. Defendant did not dispute plaintiff's expert's testimony that the transmission attenuation data for parallel polarization of 7.7 dB and perpendicular polarization of 9.5 dB is indicative of surface resistivity somewhat in excess of 100 ohms but less than 330 ohms. R. at 3188. Moreover, the evidence shows that the material shown to the Army on October 23, 1994, had short fibers with a weight of 4% so that the limitations in Claims 10 and 11 were satisfied by the sample. R. at 3190. And the evidence shows that the camouflage shown to the Army on October 23, 1994, had incisions as required by Claims 13 and 14.

The court agrees with the testimony of Dr. Thiele, that the elements of Claims 1, 10, 11, 13, and 14 are described in the report. Plaintiffs have shown that Johansson had a definite and permanent idea of a complete and operative invention as defined by Claims 1, 10, 11, 13 and 14, as it was to be applied in practice. Further, it is undisputed that the sample shown to the Army at Fort Belvoir was that described in the report. Thus, plaintiff's have satisfactorily shown a date of conception for Claims 1, 10, 11, 13 and 14 of October 23, 1970.

## 2. Conception of the DARE Screens

■ Defendant contends that Maynard Dawson conceived of the DARE screens sometime prior to October 23, 1970. Defendant presents several documents and reports prepared by the Whittaker Corporation and DARE Technology to show that Mr. Dawson had conceived of the claimed invention prior to Johansson. Plaintiff, on the other hand, argues that these documents are insufficient to establish a date of conception prior to October 23, 1970. According to plaintiff many of these documents contain inadmissible hearsay and lack reliability because Mr.

Dawson was not available to corroborate the date of conception. Plaintiff argues that because of the government's inability to make Maynard Dawson available for questioning at deposition or trial,[20] they have been denied the opportunity to challenge many of the assertions in these documents through cross-examination.

One of the documents defendant relies on is a document generated by DARE. DARE was a small company in the field of research and development. DARE was started by Maynard Dawson and Floyd F. Reichlin. Mr. Reichlin acted as the general manager while Mr. Dawson was the technical director. DARE contracted with the Army, contract DAAK02–70–C–0240, in the early 1970's to develop a macroscope, a device which used scale models of potential targets to simulate their appearance to radar (task I). By modification P00003, dated June 25, 1970, DARE also agreed to "conduct an investigation of a means for producing garnishing material for visual/radar camouflage screens...." (task II). *See* DX 60. Mr. Reichlin testified that as a result of this modification, DARE investigated radar scattering camouflage.

DARE prepared monthly progress reports to inform the Army at Fort Belvoir of its progress on task I and, later, task II under the contract DAAK02–70–C–0240. Defendant relies on one of these progress reports dated October 12, 1970, (DX 67–A) to show that Dawson conceived of the claimed invention prior to October 23, 1970, plaintiff's conception date. Up to this time, according to earlier progress reports, DARE had been investigating using bismuth in its radar camouflage. The October 23 progress report states that the use of bismuth as an anti-radar coating had been abandoned because of its fragility. The progress report stated that DARE investigated using graphite in an anti-radar coating and had four samples of graphite mixed into an epoxy matrix with surface resistivities between 0 and 115 ohms. The results, as reported in the progress report, indicate that the four samples having an epoxy thickness of 5.5 mil, 8.5 mil, 2.5 mil.,

---

**20.** The government was unable to supply witnesses who knew with certainty Mr. Dawson's present or last known address.

and 12 mil., had surface resistivities of 24 ohms, 24 ohms, 115 ohms, and less than 5 ohms, respectively for various loadings. The report went on to note that future plans included preparing a series of test samples using dispersion of graphite fibers.

As stated, proof of conception requires showing that every limitation of the claimed invention was known to the inventor at the time of conception. *Coleman*, 754 F.2d at 359. A comparison of the claims of the Johansson patent and this progress report does not show that all of the limitations of claims were known to Dawson at the time of the progress report. Many of the claimed elements are missing.

Claim 1 of Johansson specifies a camouflage means with a single electrically resistive layer being constituted by a thin inhomogeneous electrically conductive film having a surface resistivity between 100 and 1,000 ohms. Graphite is electrically resistive, and the 115 ohm sample, "specimen # 3" described in the progress report, satisfies the resistivity requirement of Claim 1. The other samples described in the report do not meet the resistivity requirement. Claim 1 also requires the camouflage to be a multi-layered sheet of flexible material having in addition to the electrically resistive layer, a substantially insulating layer. None of the listed specimens, including specimen three, is multi-layered or flexible as required by Claim 1. The court's expert, Dr. Jaggard, testified that epoxy would not be flexible. Furthermore, the specimens, including specimen three, do not have a substantially insulating layer as required by Claim 1, a point admitted by defendant's expert, Dr. Moore. R. at 3068–69.

The progress report, however, does state at the end of the report, in a discussion of future studies to be done, that a subcontract was given to produce samples using graphite in polyurethane deposited on Cerex. While not postulated by any of the three experts, the court considered whether the Cerex could be considered an insulating layer within the meaning of Claim 1. However, even considering the Cerex as an additional insulating layer, thereby satisfying the multilayer and substantially insulating layer limi-

tations the report does not indicate what the resistivities of the samples were intended to be or whether they would be flexible. The court could assume the same resistivities would be used in the future, but since three of the four samples described in the report had resistivities outside of the scope of Claim 1, the court will not make the assumption that the range of resistivities claimed in Claim 1 would be investigated absent some sort of suggestion from the progress report as to which resistivities were considered to offer the most promise. In addition, the court could assume that a sample would be flexible since polyurethane can be made flexible; polyurethane, however, can also be made rigid. Since epoxy is rigid, it may well be that DARE intended the polyurethane to be rigid as well. The point is that the court does not know what was intended and cannot know given that no one with certain knowledge testified as to what was intended.

Other claimed elements of Johansson are missing from the report. Claim 1 of Johansson also requires that the electrically resistive layer have a surface resistivity of greater than 100 ohms at "radio frequencies exceeding 2,000 MHz" to "ensure partial reflection from the object of at least 10 percent of the incident radar power." The report does not discuss which radio frequencies the resistivity measurements were taken at and does not discuss at all what type of reflection would result. While the court could perhaps deduce radio frequencies from the task at hand, given the radar camouflage frequency range 1 to 38 GHz, the resistivities of 100 to 1,000 ohms, and a reflection of greater than 10% from the screen, the court believes that it would require too many assumptions to state that someone had conceived of the claimed invention based on this report. While the report may indicate that someone was experimenting with some of the various aspects of Johansson, it does not show that anyone had formed in their mind the complete invention. Even defendant's expert would not state that the progress report, along with other documents, showed the claimed invention, unless he assumed a radio frequency and reflection. R. at 2786–2787. To show conception, defendant must show that every claimed element

was known to Dawson. The court refuses to assume that he knew many of these elements. Defendant has failed to show that Dawson had in his mind a complete and operative invention.

Even if the court found that the DARE progress report showed that someone had conceived of all of the claimed elements of Johansson, defendant has not shown that any of the ideas expressed in the report were those of Mr. Dawson. According to the progress report, DARE only decided to go forward with the investigation of graphite after discussions with the contracting officer. Indeed, DARE stated in the progress report that "[f]urther consideration on the use of finely dispersed graphite material has also led to the conclusion that the desired surface resistivity *could not* be achieved without an excessive thickness." *DARE Progress Report* at 4 (emphasis added). The report continues:

> Upon discussions with COR, it was decided that graphite still offered the greatest promise for the desired coating.... It was postulated that the high resistivity of graphite dispersions was principally due to physical contacts between individual particles. If true it was reasoned that much better results could be obtained with a dispersion of graphite fibers in which inter-particle effects would be minimized....

*Id.* at 4 (emphasis added). It is apparent from this progress report that DARE had initially determined that graphite would not work, and decided to continue pursuing a screen using graphite only after discussion with the contracting officer.

Defendant must show that the *inventor*, in this case Maynard Dawson, had formed in his mind a definite and permanent idea of the complete and operative invention as it will be applied in practice in order to show conception. *Hybritech*, 802 F.2d at 1376 (quoting 1 *Robinson On Patents* 532 (1890)). While the progress report indicates that DARE did not decide to continue experimentation with graphite *until* it had talked to the contracting officer, the report never identifies by whom this decision was made. The report was signed by Mr. Reichlin and does not state

that the work described therein is that of Maynard Dawson. Simply put, it is not clear from the report whose ideas are being discussed.

The only testimony linking the work in the progress report to Mr. Dawson is Mr. Reichlin's. Mr. Reichlin, however, was the business manager and not a technical personnel member and admitted that he did not have much contact with the development group. Mr. Dawson was not available to testify as to which portions of the work described in the progress report were his ideas. There is little evidence that the work described within the progress report was Mr. Dawson's, and defendant has failed to persuade the court that the progress report shows all of the claimed elements or that the work discussed therein was necessarily that of Mr. Dawson.

Defendant attempts to cure these deficiencies with the progress report and support its position that it shows conception with a document prepared by Whittaker Corporation. The Whittaker report was entitled Feasibility Study of Radar Camouflage System (U) ("Whittaker report") by Maynard Dawson. DX 59. According to defendant, the Whittaker report considered with the DARE progress report shows that Dawson had conceived of the invention prior to Johansson. The Whittaker report is noted to be a Final Technical Report and states the "program objective was to devise a means of making target radar signature and providing radar return from a radar camouflage system which would match that of naturally occurring foliage." The study investigated ways to provide camouflage for military targets against Side Looking Airborne Radar ("SLAR").

According to the report, various camouflage samples were prepared by different techniques. In order to determine how camouflage performance varied with surface resistivity, samples were prepared with surface resistivities of 0, 100, 300, and 1,000 ohms. The zero (or less than 1) ohm sample was prepared by applying silver paint to the camouflage material until the desired surface resistivity was obtained. The 1,000 ohm sample was made by spraying a commercial preparation, Ecco–Coat SEC material from

Emerson Cummings, on the PVC. The 300 ohm sample was prepared using a paint consisting of a mixture of graphite and Hycar. The 100 ohm sample was prepared using a silver paint diluted with butyle acetate applied in layers.

These samples were tested at Micronetics and Willow Run Laboratories. The report notes difficulties in carrying out the tests and large fluctuations in the test results. As noted by the court-appointed expert, Dr. Jaggard, a comparison of the test results show a 47% variation in the resistivities of the 100 ohm screens. Given this significant variation in experimental values, the values are, according to Dr. Jaggard, suspect.

The Whittaker report additionally reports that tests were also performed by Norton Metallized Products Division using aluminum evaporated on Mylar. The resistivity of the resulting samples, however, varied an average of 250 ohms. Moreover, the report questioned the stability of the aluminum film and stated that the samples degraded over time. It was noted in the Whittaker report, that while test results varied greatly, the 100 ohms screens provided the best compromise between terrain matching and target concealment when there is vegetation cover. The report also suggested investigating dispersed graphite in an organic binder.

Defendant's evidence also leads to the conclusion that the Whittaker report does not show a complete and operative invention. Dr. Moore, defendant's expert, testified that the Whittaker report "described an attempt to make a camouflage screen based on an incised thin material, in which they used a metallic film. The metallic film was found to degrade over time. . . ." R. at 2786–87. Dr. Moore stated that at the end of the report they determined that the screens reduced detectability of targets, but a better way to make them more mechanically stable was still needed. R. at 2787. While Dr. Moore testified that the "basic concept" of Johansson was shown, he did not state that all of the elements of Johansson were shown and stated there was a failure in mechanical or environmental stability prone to degradation over time. R. at 2787–88, 3377–78. The reported test results varied greatly and are,

thus, unreliable. While the Whittaker report may have suggested investigating graphite in an organic binder, it does not show a complete and operative invention or that anyone had appreciated the claimed invention.

Defendant's expert, Dr. Moore, presented his view as to why the Whittaker report and the DARE progress report show that Dawson had conceived of the DARE screens. According to Dr. Moore, the Whittaker report showed the basic concept, but lacked mechanical stability. Further, Dr. Moore testified that the progress report was "apparently trying to solve this problem" because the progress report states that "high resistive graphite dispersions principally due to physical contacts between individual particles" caused the instability, and that this problem was solved since it was stated in the progress report that in regards to specimen 3 "Subsequent mechanical abuse of the specimen only caused negligible changes in the surface resistivity." The progress report, however, in no way indicates that DARE was trying to solve the problems encountered in the Whittaker report. The progress report indicates the problems associated with the graphite particles was that it resulted in excessive thickness. This is the problem the progress report indicates was being solved by the reduction of inter-particle effects and preparing four samples.

The title page of the Whittaker report states that it was written by Maynard Dawson prepared for U.S. Army Mobility Equipment Research and Development Center, Fort Belvoir, Virginia. Other than the title page to the report, defendant has submitted no evidence that the ideas contained within the report were those of Mr. Dawson. Although Mr. Reichlin testified that Mr. Dawson was the primary researcher for Whittaker Corporation, Mr. Reichlin did not work with Mr. Dawson at Whittaker. Nor does he have direct knowledge of Mr. Dawson's technical contributions to the report.

Moreover, as discussed above, defendant has not shown that the ideas in the progress report were those of Mr. Dawson. Likewise there is no evidence to show that work reported in the progress report was a continuation of the work done at Whittaker. Defen-

dant relies on the fact that Maynard Dawson worked at both Whittaker and DARE to prove that the ideas in each of the documents were his. The court, however, is not willing to find conception based on such an inference. That similar ideas are expressed in each document or the fact that both discuss the pursuit of camouflage does not itself prove that all the ideas were those of Dawson.

In summary, the court finds insufficient evidence to establish conception of the claimed invention by Mr. Dawson prior to October 23, 1970. In general, an inventor's testimony as to conception must be corroborated. In this case, the court does not even have the inventor's testimony; the court has only the testimony Mr. Reichlin, who was not involved in the day-to-day technical aspects of DARE. To corroborate Mr. Reichlin's testimony, defendant relies primarily on two documents: the DARE progress report and the Whittaker report. Neither of the documents, however, show that *Dawson* had formed in his mind a complete and operative invention. While the documents relate to radar camouflage material and contain aspects of Johansson, neither, considered separately or together, shows an operative invention let alone all of the claimed elements of Johansson. Moreover, the documents do not establish that it was Dawson who had conceived of the ideas disclosed therein. While the Whittaker report states it is by Dawson and suggests using graphite, that report was dated February 1970, and DARE continued to study bismuth until some seven or eight months later, when it decided after discussions with the contracting officer to pursue graphite. No one testified as to who actually contributed certain aspects of the report. The court is not convinced that *Dawson* had formed in his mind a complete and operative invention.

While the report prepared by the court appointed expert indicates that many of the claimed elements are present in the Whittaker Final Report, the report also indicates that the values in the Whittaker report are suspect. Dr. Jaggard noted how unreliable the results were, realized the problems with the repeatability of the measurements, and warned that caution should be exercised in using the experimental values in the report. The court does not find that even if many of the claimed elements are present in the Whittaker report, that the report shows that Dawson had them formed in his mind as a complete and operative invention. Bits and pieces of the invention may be in the report, but not the complete invention as it would be used in practice.

Defendant attempts to use a combination of the DARE October 12, 1970, monthly report and the Whittaker report to invalidate the Johansson patent based on more than conception. At trial, defendant tried to elicit from its expert a statement that the claimed invention was obvious based on these two documents. Indeed, Dr. Moore testified, given certain assumptions, that one skilled in the art would have found the claimed invention obvious based on those documents. Obviousness, however, is not the issue here; the issue is conception. Defendant has never shown that these documents are prior art and was specifically limited to using these documents to show conception. Defendant, having failed to show that Dawson had formed in his mind every element of the claimed invention, tries to show that what Dawson did not know was obvious. Conception requires showing every claimed element of the invention, which defendant has failed to do.

Since defendant is not able to show that the DARE screens were conceived prior to the Johansson patent, they do not constitute prior art. Defendant's arguments that Johansson is invalid based on the DARE screens fail.

### 3. Reduction to practice & continuous diligence

▇▇▇▇ Even if the court were to find that the DARE progress report and the Whittaker report were sufficient to show that Dawson had conceived of the claimed invention prior to Johansson, defendant must show that Dawson reduced the invention to practice, and that, if that reduction to practice occurred later than Johansson's reduction to practice, he used continuous diligence from the time of his earlier conception up through his later reduction to practice. Con-

tinuous diligence covers constructing or testing an invention or embodiment as well as preparing a patent prosecution or any similar activity directed to reducing the invention to practice. Any lapse in diligence, including premature commercial exploitation, may prove fatal to establishing an earlier priority date. *In re Nelson,* 420 F.2d 1079, 1080–81, 164 USPQ 458, 459 (CCPA1970); *In re Mulder,* 716 F.2d 1542, 1545 (Fed.Cir.1983).[21] This court is not convinced that defendant has shown such reduction to practice and continuous diligence.

### B. Obviousness—35 U.S.C. § 103

 Defendant claims that the Johansson patent is invalid under 35 U.S.C § 103. Section 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole *would have been obvious* at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

(Emphasis added.) Section 103 requires the court to look at the differences between Johansson and the prior art and determine whether those differences would have been obvious to one of ordinary skill in the art when the invention was made. If the differences would have been obvious, then the invention is patent ineligible. Defendant relies primarily on two items to show obviousness: the camouflage screens made by DARE and the United States patent to Rosenthal. The court will address each in turn.

Defendant contends that the DARE screens either alone or in combination with other prior art patents render the claimed invention obvious. Before the DARE screens may be considered in a § 103 obviousness analysis, defendant must show that they constitute prior art. Defendant had failed to do this. The DARE screens were not made until May of 1971, which is after the filing date of the Johansson patent on April 6, 1971. As a result they do not qualify as prior art. The DARE screens would only qualify as prior art if they were conceived before the claimed invention and then reduced to practice through continuous diligence. As discussed above, defendant cannot show prior conception of the DARE screens and the DARE screens do not qualify as prior art to the Johansson patent. Because the DARE screens are not prior art under § 103, Defendant's obviousness arguments based on the DARE screens must fail. Likewise, defendant's arguments that the claimed invention is obvious based on the DARE screens considered in combination with other references must fail.

Next, defendant contends that the claimed invention is obvious under § 103 based on the Rosenthal patent taken alone and in combination with other references. The Rosenthal patent describes a flexible radar radiation attenuator or blanket that is intended to improve radar camouflage. As the patent indicates, it uses a quarter wavelength spaced layers to provide destructive interference of the reflected waves from each layer. The court appointed expert, Dr. Jaggard, distinguished the Rosenthal patent's operation based on interference principles from the Johansson patent, which operates based on an absorption principle. Furthermore, Rosenthal also provides a plurality of layers to achieve radar dissipation through interference. In describing the operational principle of Rosenthal, Dr. Jaggard noted, "a plurality of layers is *necessary* for operation and the use of destructive interference is crucial to the stated operation." The court agrees. There is no teaching or suggestion in Rosenthal to use only a single layer. In fact, Rosenthal requires more than one layer for operation and in that respect teaches away from the Johansson patent. The court agrees with Drs. Thiele and Jaggard that Rosenthal operates on a fundamentally different principle than Johansson.

---

21. There are only a few recognized excuses for lapses in continuous diligence, including: the inventor's continuous, extreme poverty or illness, the patent attorney's previous caseload, or the need to test the invention. *See, e.g., Bey v. Kollonitsch,* 806 F.2d 1024, 1029 (Fed.Cir.1986); *Watkins v. Wakefield,* 443 F.2d 1207, 1210 (CCPA1971).

The secondary references relied on by defendant do not cure the deficiencies in Rosenthal. First, as discussed, Rosenthal requires a plurality of layers for operation; thus, there is no suggestion in Rosenthal to combine it with references showing a single layer of camouflage. Second, even combined with the secondary references, Rosenthal does not teach or suggest the claimed invention. Although not necessary since the primary reference, Rosenthal, is fundamentally different from the claimed invention, the court will briefly address the secondary references. As Dr. Jaggard reported, Clough '781, Wesch '680, and Wesch '259 operate on interference principles and are fundamentally different from Johansson. Indeed, the secondary references show certain features present in the dependant claims, but not one cures the above-discussed deficiencies of Rosenthal vis a vis Claim 1. Thus, defendant has failed to show that Johansson '606 is invalid.

### IV. *Enforceability.*

 Defendant raises unenforceability as a defense to plaintiff's charges that the government infringed Johansson '606. When applying for a patent, all applicants have an affirmative duty to disclose to the Patent and Trademark Office ("PTO") all information that they reasonably believe is material to the patent prosecution. In addition, all patent applicants are required to refrain from making any misrepresentations regarding the facts concerning the invention and the patent application. 37 C.F.R. § 1.56 (1992). Violation of this duty constitutes inequitable conduct and renders a patent, which is otherwise valid and enforceable, unenforceable. The materiality of omitted information alone does not determine a breach of this duty of candor, however, as the Federal Circuit decided in *Kingsdown Medical Consultants Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir.1988) (en banc), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). "Inequitable conduct resides in failure to disclose material information, or submission of false information, with an intent to deceive.... The involved conduct, viewed in light of all of the evidence, including evidence indicative of good faith, must indicate suffi-

cient culpability to require a finding of intent to deceive." *Kingsdown,* 863 F.2d at 872, 876. The Federal Circuit also reasoned that while "gross negligence does not of itself justify an inference of intent to deceive," inequitable conduct with regard to a single claim is enough to render an entire patent unenforceable. *Id.* The two part inquiry for determining unenforceability was explicitly set-forth in *Halliburton Co. v. Schlumberger Tech. Corp.,* 925 F.2d 1435, 1439–40 (Fed.Cir. 1991):

> The doctrine of inequitable conduct requires a trial court to undertake a two-step analysis. The trial court must discern whether the withheld references satisfy a threshold level of materiality. The court must also determine whether the applicant's conduct satisfies a threshold showing of intent to mislead.... Next, assuming satisfaction of the thresholds, the trial court must balance materiality and intent.... The more material the omission, the less culpable the intent required, and vice versa.... The trial court has discretion to determine inequitable conduct.

*Id.*

 The two elements of inequitable conduct are considered on a sliding scale such that a strong showing of either materiality or intent may compensate for a mere threshold showing of the other. *Id.* As the questions of fraud and inequitable conduct are equitable in nature, the trial court exercises its discretion in determining whether a patent is unenforceable for these reasons. The ultimate question whether there was fraud or inequitable conduct must be proven by clear and convincing evidence and is reviewed under an abuse of discretion standard. *Kingsdown,* 863 F.2d at 876. "Abuse of discretion may obtain when the ruling reflects an erroneous application or interpretation of law, or shows a clear error of judgment, or is based on clearly erroneous factual findings." *Northern Telecom Inc. v. Datapoint Corp.,* 908 F.2d 931, 937 (Fed.Cir.1990); *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1574 (Fed.Cir.1991).

 Rejecting the view that materiality must be determined by a *sine qua non* stan-

dard, the Federal Circuit has explained that the standard for materiality is whether a reasonable patent examiner would have considered the withheld information important in deciding whether to issue the patent. *Merck & Co. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1421 (Fed.Cir.1989). The determination of whether there was intent to deceive the PTO on the part of the patent applicant is made "in light of the realities of patent practice.... Given the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive, clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required.... [A]ll of the circumstances are considered, including indications of good faith ..." *Northern Telecom,* 908 F.2d at 939.

■ Defendant baldly asserts that Barracuda's failure to disclose four patents in its continuation in part ("CIP") application constitutes inequitable conduct. Since the government is claiming inequitable conduct, it must show that Barracuda obtained its patent by intentional misrepresentation or the withholding of a material fact from the PTO. The government argues that plaintiff's failure to disclose Rosenthal '397, Wesch '680 and Eltro '851, which were previously disclosed by plaintiff in its parent application, amounts to an intentional omission of material fact from the CIP examiner. These material references, however, did not constitute *new matter* and were included in the file for plaintiff's parent application, which the CIP examiner is *required* to review as part of the same prosecution, as long as the parent application has not been already patented, abandoned, or terminated. *See* 35 U.S.C. § 120 (1984); *See generally Litton Sys., Inc. v. Whirlpool Corp.,* 728 F.2d 1423 (Fed.Cir. 1984). Defendant has presented no evidence of bad faith on the part of plaintiff, and this court stands unconvinced that plaintiff acted inequitably. Finally, defendant argues that plaintiff's failure to disclose a fourth reference, Clough '781, amounts to fraud, even though it does not teach the general principal of the invention described and claimed by Johansson '606. *See Jaggard Report* at 20. Defendant's deficiency of evidence on this issue has failed to persuade the court that non-disclosure of Clough '781 constitutes either a material omission or fraud on the part of plaintiff, Barracuda. Johansson '606, therefore, is not unenforceable due to inequitable conduct.

### *CONCLUSION*

After careful consideration of the testimony, exhibits, arguments, and the applicable law, the court has concluded that defendant prevails with respect to the claims of infringement of the Klein patent and infringement of the Johansson patent under the A117 and B007 contracts. Plaintiff prevails with respect to the claims of infringement of the Johansson patent under the A060, A063, C288, and C0180 contracts. The issue of damages will be decided in a separate opinion in due course.

IT IS SO ORDERED.